IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

|  |  |
|---|---|
| DANNY LEE WARNER, | Cause No. CV 22-08-H-BMM-JTJ |
| Plaintiff, |  |
| vs. | ORDER |
| DEMETRIC GODFREY, et al., |  |
| Defendants. |  |

Plaintiff Warner, acting pro se, moves to proceed in forma pauperis with this action under 42 U.S.C. § 1983, alleging violations of his civil rights. Warner's complaint arises from his incarceration at Montana State Prison in Deer Lodge, Montana, and at Crossroads Correctional Center in Shelby, Montana.

## I. Motion to Proceed In Forma Pauperis

At the time he filed this action, Warner had considerably more money than most prisoners. In view of the passage of time, however, he adequately demonstrates that he is not able to pay the filing fee in full. His motion to proceed in forma pauperis will be granted. *See* 28 U.S.C. § 1915(a)(1).

Because Warner is a prisoner, he must pay a $350.00 filing fee in installments taken from his inmate trust account, consisting of 20% of each month's deposits into the account, provided the balance is at least $10.00. The

1

Court will waive the initial partial filing fee because it is not clear Warner could pay it. The total fee and the rate of withdrawal are established by Congress and cannot be altered by the Court. *See* 28 U.S.C. §§ 1914(a), 1915(b)(1), (2), (4); *Bruce v. Samuels*, 577 U.S. 82, 84 (2016). A collection order accompanies this Order.

## II. Screening

Because Warner is a prisoner and is proceeding in forma pauperis, the Court must review the complaint to determine whether it fails to state a claim on which relief may be granted. *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(a), (b)(1). A federal court must liberally construe pleadings filed by unrepresented prisoners and allow an opportunity to amend where appropriate. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012).

## III. Analysis

Many of Warner's claims are not sufficient to support further proceedings. The Court must explain deficiencies in the pleading so that Warner has a reasonable opportunity to correct them if he wishes to proceed.

### A. Legal Grounds for Relief

The following law applies to many or all of Warner's claims. His mail and religion claims under the First Amendment and his Eighth Amendment claims are

addressed in Part C, below, in connection with specific claims.

### 1. Elements of Claims Under 42 U.S.C. §§ 1983 and 1985

Warner alleges other legal bases for relief, *see, e.g.*, Compl. ¶¶ 123, 133, but most of his claims rely on 42 U.S.C. §§ 1983 and 1985.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Naffe v. Frey*, 789 F.3d 1030,1035–36 (9th Cir. 2015). Officials and employees having custody of state prisoners at Montana State Prison and at Crossroads act under color of state law. Warner's claims meet the second element. As explained in Part C, below, not all of Warner's allegations meet the first element.

To state a claim under § 1985(3), the plaintiff must show (1) a conspiracy; (2) driven by a class-based, invidiously discriminatory animus; (3) aimed at interfering with or depriving him of rights protected against private as well as public encroachment; (4) an act in furtherance of the conspiracy; and (5) an resulting injury or deprivation of rights. *See, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993) (elements 2 and 3); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1185 (N.D. Cal. 2022) (citing *Life Ins. Co. of N. Am. v. Reichardt*, 591 F.2d 499, 502 (9th Cir. 1979)).

The Court will assume, without deciding, that Warner's allegations meet the second element because he alleges discriminatory animus against his religion. *See, e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 101–02, 105 (1971); *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980). The discussion in Part C, below, will focus on the other elements.

### 2. Claims of Retaliation and Discrimination

Many of Warner's claims allege one or more defendants retaliated or discriminated against him. (He also alleges harassment, but the Court views the as a synonym for retaliation or discrimination.)

A retaliation claim under § 1983 has five elements:

> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005); *see also id*. at 567 n.11 (noting that allegation of "harm that is more than minimal" may serve as an allegation of chilling effect); *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016) (citing *Turner v. Safley*, 482 U.S. 78, 84–85(1987)); *Bruce v. Ylst*, 351 F.3d 1282, 1288 (9th Cir. 2003); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

The complaint[1] must support an inference that the defendant's intent to

---

[1] Ultimately, at trial, a plaintiff must prove retaliation was the but-for cause of a

retaliate was at least a substantial or motivating factor in the decision to take action adverse to the plaintiff. *See Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

The Equal Protection Clause also protects prisoners against intentional discrimination on the basis of religion. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). Again, however, a plaintiff must allege facts supporting an inference of discriminatory purpose. *See Iqbal*, 556 U.S. at 676–77; *Washington v. Davis*, 426 U.S. 229, 239–40 (1976).

### 3. Due Process

The Fourteenth Amendment guarantees due process to an inmate who is deprived of liberty or property, generally before the deprivation may occur. An inmate has a protected interest in liberty or property only if he has a "legitimate claim of entitlement" to the liberty or property taken from him.

### (a) Deprivation of Liberty

Because a prisoner's liberty is already diminished by his incarceration, not every change in custody is protected by due process. A prisoner has a protected liberty interest entitling him to due process only when prison officers take actions

---

defendant's adverse action. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006).

that either (1) affect the sentence imposed upon conviction in an unexpected manner, or (2) impose a hardship that is atypical and significant in relation to the ordinary incidents of prison life.  *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995); *Brown v. Oregon Dep't of Corrs.*, 751 F.3d 983, 987 (9th Cir. 2014). *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). Whether a hardship is "atypical and significant" depends on three factors:

> (1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; (2) the duration of the condition, and the degree of restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence.

*Ramirez*, 334 F.3d at 861; *see also Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007) (holding that inmate was not deprived of a liberty interest where he was placed at a higher security level than indicated by calculation under controlling prison regulations).

A wide range of placement decisions do not deprive inmates of liberty interests in prison. Placement in segregation generally falls within the ordinary incidents of prison life, *see Toussaint v. McCarthy*, 801 F.2d 1080, 1091–92 (9th Cir. 1986), and so "comport[s] with the prison's discretionary authority," *Ramirez*, 334 F.3d at 861. In *Brown*, the court found a liberty interest where the inmate was placed in segregation that was destined to exceed two years and that allowed him to be out of his cell for only 40 minutes per day.  In *Ramirez*, the court was unsure

whether a two-year stay in segregation gave rise to a liberty interest. In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court did not decide whether placement in a supermax prison, where lights are on 24 hours a day, and exercise is permitted only for one hour per day in a small indoor room, gave rise, under *Sandin*, to a liberty interest. It instead noted the existence of additional factors that did support a liberty interest. *See id*. at 223–24.

In sum, to show a liberty interest, the inmate must compare and contrast his previous circumstances with his present circumstances.

## (b) Deprivation of Property

Jail officials must provide due process before they deprive inmates of property pursuant to policies or rules. But it is impossible to provide due process before an unexpected and unauthorized deprivation of property, such as might be caused by loss, accident, or theft. When an inmate's property loss is not authorized, the due process guarantee is satisfied if an adequate post-deprivation remedy is available to the inmate. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 129-130 (1990); *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (per curiam). The Montana Tort Claims Act, Mont. Code Ann. §§ 2-9-101, *et seq.*, provides just such a remedy—the process that is constitutionally due. That remedy is adequate even if it does not provide the same relief under the same conditions as an action under § 1983 would. *See Hudson*, 468

7

U.S. at 531.

### 4. Injunctive or Declaratory Relief

Warner is no longer incarcerated in Montana. This fact may affect his lawsuit in two ways.

First, in addition to 42 U.S.C. §§ 1983 and 1985, Warner also invokes the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5. *See, e.g.*, Compl. ¶ 126. RLUIPA supports claims for injunctive relief "against a government," not against individuals, and it supports only claims for injunctive relief, not claims for money damages. *See* 42 U.S.C. § 2000cc-2(a); *Sossamon v. Texas*, 563 U.S. 277, 288 (2011); *Wood v. Yordy*, 753 F.3d 899, 902–04 (9th Cir. 2014).

Second, a court "shall dismiss" a claim brought by a prisoner if it "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(iii); *Chavez v. Robinson*, 817 F.3d 1162, 1169 (9th Cir. 2016). A defendant is entitled to qualified immunity against claims for money damages under 42 U.S.C. §§ 1983 and 1985, *see, e.g.*, *Kelly v. City of Oakland*, 198 F.3d 779, 781 (9th Cir. 1999), unless the law governing the situation underlying the claim is clearly established, *see, e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 638–40 (1987). If there is room for argument about how the law applies or ought to apply to the facts, then qualified immunity applies, and damages are not available. *See*

*Mullenix v. Luna*, 577 U.S. 7, 8–10, 11–19 (2015) (per curiam); *White v. Pauly*, __

U.S. __, 137 S. Ct. 548, 549–50, 551–52 (2017) (per curiam).

Qualified immunity does not protect defendants against claims for

declaratory or injunctive relief. *See, e.g.*, *Anderson*, 483 U.S. at 646 n.6; *Mitchell v.*

*Forsyth*, 472 U.S. 511, 526 (1985); *Hydrick. v. Hunter*, 669 F.3d 937, 942 (9th Cir.

2012). To obtain declaratory relief, a plaintiff must show "a substantial and

important question *currently* dividing the parties." *Los Angeles County Bar Ass'n*

*v. Eu*, 979 F.2d 697, 703–04 (9th Cir. 1992) (emphasis added). Declaratory relief is

not available when the plaintiff contests an action taken in the past. Additionally,

injunctive relief generally is not available when a prisoner-plaintiff is transferred to

another prison. *See, e.g.*, *Preiser v. Newkirk*, 422 U.S. 395, 402–03 (1975); *Pride*

*v. Correa*, 719 F.3d 1130, 1138 (9th Cir. 2013).

In sum, at this point, it does not appear that Warner is entitled to either

declaratory or injunctive relief. If that is the case, then he cannot state a claim

under RLUIPA, and all claims supporting a defense of qualified immunity must be

dismissed. Warner is not required to plead facts showing that qualified immunity

does not apply. But if he knows of facts supporting an inference that he will return

to Montana State Prison or Crossroads, he must say what they are in an amended

pleading.

## B. General Defects of the Pleading

### 1. Stating a Claim Under Federal Law

A complaint must contain "a short and plain statement of [each] claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement is met by focusing on facts:

> [A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).

### 2. Defendants

Warner sues all defendants in their individual and official capacities. Even if he can no longer obtain injunctive or declaratory relief, all defendants may still held be liable in their individual capacities.

Under 42 U.S.C. § 1983, a defendant is liable only if he or she personally causes or contributes to causing a violation of the plaintiff's rights. "The inquiry into causation must be individualized and [must] focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th

Cir. 1988); *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). As to each defendant he seeks to hold responsible in connection with a claim, Warner must describe what each defendant did or failed to do and how that action or inaction caused or contributed to causing a violation of his constitutional rights. *See, e.g.*, *Lacey v. Maricopa County*, 693 F.3d 890, 915–16 (9th Cir. 2012) (en banc).

Likewise, whether accompanied by an allegation of conspiracy or not, an allegation of discrimination or retaliation must be supported by facts supporting an inference that each individual defendant intended to discriminate or retaliate against the plaintiff. If one defendant shoves a plaintiff to retaliate against him for filing a grievance and another defendant shoves the plaintiff in an attempt to subdue him, the first defendant may be liable and the second not. Merely saying that two or more defendants conspired or acted together does not show they both harbored the same intent. A plaintiff must allege facts showing why he thinks each defendant had the intent to discriminate or retaliate against him. *See Iqbal*, 556 U.S. at 686–87.

### 3. Conclusory Allegations

A conclusory allegation merely states that something is so, without describing facts and circumstances supporting a reasonable inference that it is so. For instance, Warner says, "In early January 2020, Plaintiff was transferred back to [Crossroads Correctional Center] as retaliation for his grievances and lawsuit;

11

neither Warden McTighe nor Plaintiff wanted him there." Compl. ¶ 74. This allegation does not show what facts or circumstances support an inference that his transfer was retaliatory. The allegation is "merely consistent with a defendant's liability" and provides no facts showing why Warner believes the motive was retaliation rather than a humdrum administrative decision.  For that reason, the allegation "stops short of the line between possibility and plausibility of entitlement to relief."

### C. Defects in Specific Paragraphs

#### Paragraphs 33–42

These paragraphs appear to be time-barred and do not appear to be curable by amendment. Warner filed his complaint on January 28, 2022. All claims accruing prior to January 28, 2019, *see* Compl. (Doc. 2) ¶¶ 33–42; Compl. Exs. A1–A16 (Doc. 2-1 at 2–17), are barred by the three-year statute of limitations, *see Wallace v. Kato*, 549 U.S. 387, 388 (2007); Mont. Code Ann. § 27-2-204(1); *Belanus v. Clark*, 796 F.3d 1021, 1025 (9th Cir. 2015).

The limitations period is tolled to allow an inmate to exhaust administrative remedies, *see Brown v. Valoff*, 422 F.3d 926, 942–43 (9th Cir. 2005), but Warner's exhibits do not suggest his exhaustion continued beyond January 8, 2019, *see* Compl. Exs. A13–A16 (Doc. 2-1 at 14–17).

### Paragraphs 43–46

Warner contends that Defendant Wigert confiscated a religious drawing from him in order to "discriminate, harass, and retaliate against" him. He submitted a grievance stating that she ought to be able to tell the difference between religious material and "STG material," that is, security threat group material. His complaint states that the "STG writeup" was dismissed but he lost his drawing. He asserts that Wigert later brought another disciplinary charge against him, apparently relating to visitation. It was also dismissed. Warner alleges that Wigert sent officers to "trash Plaintiff's cell for an hour." He claims that two sergeants told him Wigert was "more interested" in Warner than "any other inmate or actual gang member." He also contends that Defendants Reich and Lochrie refused to process his grievances in order to protect Wigert. Warner asked for an investigation into Wigert's actions. His request was granted, but the investigation uncovered no evidence of discrimination. *See* Compl. ¶¶ 43–46; Compl. Exs. A17–A20 (Doc. 2-1 at 18–21).

Warner does not allege facts showing why Wigert should have known the drawing was only religious and not STG material, why her second disciplinary charge was dismissed or why she should have known it would be, why he says officers "trashed" rather than "searched" his cell, or why the sergeants' alleged comments show that Wigert did something wrong. As to Reich and Lochrie,

Warner's own exhibits show that they did not process his grievances for reasons related to the grievance procedure. *See* Compl. Exs. A17–A18 (Doc. 2-1 at 18–19). The facts Warner alleges are at least as consistent with Wigert, Reich, and Lochrie simply doing their jobs as they are with Warner's claim that they retaliated against him or harassed him. *See Iqbal*, 556 U.S. at 678.

### Paragraphs 47–48

Warner claims all of his personal property was disposed of without due process when he was transferred from Crossroads Correctional Center to Montana State Prison ("MSP") at the end of January 2019. He also contends that he was not permitted to appeal his classification or challenge his placement in solitary confinement and that he did not have access to his legal materials despite his involvement in an ongoing lawsuit.

Warner does not identify anyone responsible for these decisions or deprivations, explain what process he believed to be due in connection with any of these events, or explain whether he was deprived of his property according to policy or through the negligence or malfeasance of specific persons acting contrary to policy. He does not explain how long he was placed in solitary confinement.

Warner does not explain how long he lacked access to his legal materials or whether or how he lost something in court as a result. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 356–57 (1996).

Warner was not entitled to due process in connection with his classification. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007).

### Paragraphs 49–53

Warner states that, "at various times," cells—presumably meaning cells in solitary confinement, although this is not clear—were not "well ventilated, appropriately heated, and . . . sanitary;" laundry services were not regularly provided; and recreational opportunities were inadequate. He also objects to lack of a "call button" in his cell for use in a medical emergency.

Prison conditions may be restrictive and harsh, but prisoners must have "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). A convicted prisoner, like Warner, must allege facts supporting an inference that prison officials both knew of facts that could show a prisoner had inadequate "food, clothing, shelter, sanitation, medical care, [or] personal safety," *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995), and also disregarded a substantial risk of serious harm to the prisoner, *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015).

A prisoner must also show how the condition of which he complains harmed him. To take two examples, a temporary denial of exercise without medical effect

15

does not violate the Constitution. *See May v. Baldwin*, 109 F.3d 557, 565–66 (9th Cir. 1997). Inadequate ventilation may violate the Constitution only if it "undermines the health of inmates and the sanitation of the penitentiary." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (internal quotation marks and citation omitted), *as amended*, 135 F.3d 1318 (9th Cir. 1998).

Warner fails to explain what his individual conditions were, how long they persisted, and/or what harm he suffered. He does not identify any defendant responsible for these conditions. He does not allege facts showing that any defendant both knew of and disregarded an excessive risk that he would suffer harm. A defendant's failure to agree with Warner's description of a problem, *see, e.g.*, Compl. Exs. N14–N18 (Doc. 2-1 at 185–189), does not show that the defendant both knows and chooses to disregard a real and substantial risk of serious harm.

### Paragraph 54

Warner claims the Montana Constitution entitles him to rehabilitative or educational opportunities. An act that happens to violate state law or policy will support a claim under § 1983 only if the act violates federal law. *See Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 933 (9th Cir. 2017); *Galen v. County of Los Angeles*, 477 F.3d 652, 662 (9th Cir. 2007).

The federal Constitution does not confer entitlement to rehabilitative or

educational opportunities. *See Coakley v. Murphy*, 884 F.2d 1218, 1221 (9th Cir. 1989); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985); *Hoptowit v. Ray*, 682 F.2d 1237, 1254–55 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

### Paragraph 55–60

Warner alleges that mail is frequently returned to the sending "family, friends, and Odinist organizations" for failure to comply with prison policy. He claims that the practice violates due process and the First Amendment and that he must receive notice when mail addressed to him is not delivered. Warner also claims the prison changed its mail regulations without providing reasons and an opportunity for public comment and that he cannot be required to inform his correspondents of such abrupt changes.

Prisoners do not forfeit their constitutional rights simply because they are in prison. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979). But "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal quotation marks and citation omitted). "When a prison regulation impinges on inmates' constitutional rights, the

17

regulation is valid if it is reasonably related to legitimate penological interests."[2] *Turner v. Safley*, 482 U.S. 78, 89 (1987). "Taken together, *Iqbal* and *Turner* require an inmate to plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest." *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012) (internal quotation marks and citation omitted).

Publicly available DOC and MSP policy imposes restrictions on mail that outside correspondents may send to inmates and authorizes prison staff to return noncompliant mail to the sender without notifying the inmate. Restrictions on adhesives, on markings made with markers, crayons, glitter, and the like, and on printed postcards, greeting cards, or "unusually thick" paper or stationery are neutral and reasonably related to a legitimate need to prevent the smuggling of illegal substances into the prison. *See Noe v. True*, No. 21-1373, 2022 WL 5080196 at *8–*9 (10th Cir. Oct. 5, 2022); DOC Policy No. 3.3.6 § IV(B)(5)–(7). Warner alleges that "the most common reason" for returning mail to the sender is the use of self-adhesive stamps. Compl. ¶ 58. He does not allege facts showing that the policy restrictions are unrelated to a legitimate interest such as the prevention of drug-smuggling.

---

[2] The *Turner* test does not apply to Eighth Amendment claims.

Occasional deviations from policy are inevitable and, at most, indicate some degree of negligence or oversight. They do not, by themselves, amount to constitutional violations. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986); Compl. ¶ 57 (alleging that "on at least one occasion" a letter was opened rather than returned to the sender still sealed). Additionally, policy allows mail to be opened to verify the sender's identity. Warner alleges no facts supporting an inference that the policies defining permissible forms or features of mail are applied in a discriminatory manner. *See, e.g.*, *Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022).

Warner does not allege facts showing that requiring him to notify his correspondents of the prison's policies is unduly or unnecessarily burdensome to him or to his correspondents. Nor is it essential for him to do so, as policies governing inmate mail are publicly available on the Department of Corrections website. The Court is not aware of any law requiring state prisons to provide advance notice and an opportunity for public comment before implementing changes to any policy, including but not limited to mail policies.

### Paragraph 61

Warner objects to a policy proscribing pen pal packets. Case law supports a distinction between services that supply lists of nonprisoners, including names, addresses, and contact information, and services that match an inmate with a

nonprisoner. The former may be prohibited, but the latter reduce the risk of fraud and may be permitted. *See Perry v. Secretary, Florida Dep't of Corrs.*, 664 F.3d 1359, 1363 (11th Cir. 2011); *see also, e.g.*, *Merrick v. Linderman*, 858 Fed. Appx. 250, 251 (9th Cir. 2021) (applying *Bahrampour v. Lampert*, 356 F.3d 969, 973 (9th Cir. 2004)). This appears to parallel the distinction between "Friends Beyond the Wall" and "Prison Pen Pals," whose mail was rejected as providing "pen pal packets," and the "Order of Malta" letter, which offered to match Warner with one pen pal. *See* Exs. B18–B27 (Doc. 2-1 at 40–49). Warner does not allege facts showing that the policy restrictions are unrelated to a legitimate interest.

### Paragraphs 62–64

Warner alleges that MSP policy regarding sexually explicit photographs is too restrictive, as it requires that an inmate's wife or girlfriend must have "every inch of her skin covered with clothing" and prohibits use of a "pose to look pretty." (This is not what the policy says.) He also contends that policies limiting an inmate to five photographs per envelope and allowing only approved vendors to send in books or money unconstitutionally infringe on his First Amendment rights.

Again, these policies appear to be reasonably related to institutional security. Allowing inmates to view sexually suggestive magazines or television programs but restricting suggestive photos of the same nature, *see* Exs. B28–B31 (Doc. 2-1 at 50–53), is not contradictory. Some inmates are likely to feel differently about a

fellow inmate's expression of interest in a photograph of someone he knows as opposed to a person in a magazine or on television. Limiting the number of photographs in one envelope reasonably eases the burden of processing the mail. The same is true of limiting the persons who can receive or send money to approved correspondents or vendors, which prevents fraud where money is concerned and smuggling of contraband where books are concerned. Warner does not allege facts showing that these policies are not reasonably related to the legitimate objective of maintaining institutional safety.

### Paragraphs 65–66

Warner asserts that "history and biography books have been erroneously deemed to advocate some type of racial supremacy, even when they clearly do not." His exhibits identify two books: *March of the Titans: The Complete History of the White Race, Vol. 2*, by Arthur Kemp, and *Gods of the Blood: The Pagan Revival and White Separatism*, by Mattias Gardell. *See* Compl. Exs. B43, B49 (Doc. 2-1 at 65, 71).

"[L]iterature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation." *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir. 1987). But disagreements about what actually advances a legitimate

21

penological objective do not violate the Constitution. Warner asserts the decision not to allow these books was incorrect, but he does not allege facts showing why he believes the decision was discriminatory or not reasonably related to a legitimate penological interest.

### Paragraphs 67–68

Warner avers that he was designated a member of an STG without due process. He was entitled to due process only if he shows that the STG designation imposed on him an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Although Warner states that the designation affects "everything from housing, job assignments, and disciplinary, to security classification and even parole decisions," he does not allege facts showing how STG designation affects these things. Further, all of these decisions appear to fall within the wide range of ordinary incidents of prison life.

### Paragraphs 69–70

Warner alleges some defendants disregarded or violated prison policy and/or state law. A state law or policy can create a liberty interest such that a plaintiff is entitled to due process before he can be deprived of it. But simply violating state law or policy does not violate federal law and does not support a claim under 42 U.S.C. § 1983. Warner must explain why he believes he was entitled to the

22

enforcement of the state law or why failure to implement changes allegedly required by state law imposed an atypical and significant hardship on him. *See Sandin*, 515 U.S. at 483–84; *Brown*, 751 F.3d at 987.

### Paragraphs 71–73, 109

Warner asserts that correspondence he marked "privileged mail" and attempted to send to various public figures and organizations did not reach its destinations. Fourteen more incoming or outgoing letters to or from Odinist groups or individuals also "come up missing." Warner asserts that no one investigated to determine what happened to his "privileged" mail. Warner believes "the only inference that can be drawn" is that his letters "were disposed of intentionally and maliciously in retaliation." Compl. ¶ 72; *see also id.* ¶ 109.

The facts alleged do not support this inference. Warner does not say how he knows his mail did not arrive where it was sent. He does not say whether the mail, incoming or outgoing, complied with policy. It is also not clear why or under what policy he labeled his outgoing mail "privileged" or what he believed that designation would mean. The Court does not understand what Warner means when he says Defendant Reich "went out of her way" to "ensure" there would be no investigation or how she prevented him from filing a grievance. (The exhibits he mentions, Compl. Exs. D9–D10 (Doc. 2-1 at 91–92) are too faint to be legible.)

### Paragraphs 74–75

23

Warner alleges that he was transferred from Montana State Prison to Crossroads Correctional Center in January 2020 "as retaliation for his grievances and lawsuit." He claims that, over the next three weeks, he was "harassed constantly" by staff, "had his legal materials withheld," "was denied access to the law library, and was told he could not send out legal mail." He states that "numerous items of [his] personal property simply came up missing," including his television, and two letters friends sent to him "vanished."

These allegations do not explain what actually happened or how Warner was harmed as a result, or, again, why Warner believes the prison was responsible for the loss of his friends' two letters. Warner fails to identify any responsible defendant. And the facts he alleges do not support an inference that his transfer was retaliatory. Prisoners are frequently transferred from one prison to another.

### Paragraphs 76–77

Warner complains that he was placed in the restrictive housing unit ("RHU") at Crossroads on January 29, 2020, based on a retaliatory and false disciplinary report. He says:

> Any argument that Plaintiff did something wrong by exercising in a dayroom that has exercise equipment in it (and no rule that inmates cannot exercise in the dayroom) because there were others exercising at the same time is unavailing considering . . . [that] Plaintiff is the only person who was placed in RHU or given a disciplinary report—a clear sign that he was targeted for harassment and retaliation.

Compl. ¶ 77; *see also* Compl. Ex. (Doc. 2-1) at E1–E2.

24

These allegations might suggest retaliation. They are at least equally consistent with an inference that Warner's behavior was disruptive and the disciplinary proceeding reasonably advanced a legitimate correctional goal. *See Rhodes*, 408 F.3d at 567–68. The exhibits Warner later cites in ¶ 83 suggest he was disciplined for gathering prisoners without authorization, not for exercising, and that his hearing ended when he kicked a chair that "made contact" with an officer. *See* Compl. Ex. E1–E2 (Doc. 2-1 at 94–95). If he intends to proceed on this claim, he must explain what actions he took and what actions staff took and explain why he believes the disciplinary report was retaliatory rather that a reasonable response to a perceived violation.

### Paragraphs 78–81

These allegations have the same defects as ¶¶ 69–70. Additionally, Warner's reference to Defendants' deliberate indifference to his "'serious mental health problems,'" Compl. ¶ 79, is conclusory.

### Paragraphs 82–85

Warner alleges that he transferred back to Montana State Prison on February 4, 2020, without first having a hearing on the "exercising" disciplinary violation. *See* Compl. ¶¶ 83–85. He also says he completed the disciplinary sanction on February 5, *see* Compl. ¶ 86, just eight days after being placed in the RHU. He does not allege facts showing why placement in the RHU for eight days should be

viewed as causing him an atypical and significant hardship. *See Sandin*, 515 U.S. at 483–84; *Brown*, 751 F.3d at 987.

**Paragraphs 86–92**

Warner asserts that he was held "in limbo" in the RHU for two or three more days, with no access to his legal materials, the law library, or his personal property. He was classified to RHU for an indeterminate period of time and, on February 7, was placed in a cell that was "covered in blood and feces, with grime and food caked to the floor that looked to be weeks, if not months old, and smelled of urine and vomit." He was denied cleaning supplies for five days. When he asked to be tested for communicable diseases, his request was denied. On February 13, Warner asked for a tablet to do legal work but was denied one for "several weeks," despite having a civil action pending.

Warner claims "[t]he law require[d]" that he know how long he would be in the RHU. *See* Compl. ¶ 88. The Court is not aware of any federal right guaranteeing that an inmate will know how long he will be held in a particular cell or area. The conditions in Warner's cell for five days were no doubt very unpleasant, but they do not support an inference that he was placed at substantial risk of serious harm or deprived of the minimal civilized measure of life's necessities.  *See Farmer*, 511 U.S. at 834; *Rhodes*, 452 U.S. at 347. He does not explain how he was affected by not having a tablet.

### Paragraphs 93–95

On February 20, Warner began a hunger strike. He was "harassed and degraded" every day. On February 26, Defendants Godfrey and McNeil and 15 other officers cuffed him and searched his cell, destroyed property and legal materials, and threatened him in an attempt to intimidate him into ending his hunger strike. Warner alleges that he as "scared enough to begin eating the next day," but "Godfrey would follow up on his threats and retaliate on [Warner] several times afterwards." Compl. ¶¶ 93–94.

Warner's references to being harassed, degraded, threatened, and intimidated are conclusory, as is his allegation that the defendants destroyed property and legal materials. Without knowing what the defendants said and did and what Warner lost as a result, the Court cannot draw an inference that the defendants' actions were adverse to him or that they would chill the First Amendment exercise of a person of ordinary firmness.

Paragraph 95 may lead to evidence, but it does not contribute to stating a claim.

### Paragraph 96

Warner claims Godfrey said "he did not like White people and that Odinism was nothing more than 'White supremacy.'" Godfrey told Warner he would "have Plaintiff sent to the 'blackest' prison he could and the inmates would fix him right

up." Warner alleges that Godfrey engineered his transfer from Montana State Prison to one of the federal prison facilities in Terre Haute, Indiana. On his arrival, someone told Warner "he did not belong there" and "whoever DJ is does not like you very much, because he put you here and asked that we teach you a lesson."

The transfer to BOP custody was of course out of Godfrey's control, but to the extent Warner alleges Godfrey influenced Warner's destination to "teach him a lesson," he appears to minimally satisfy the elements of a retaliation claim.

### Paragraphs 97–98

Warner claims he tried to file grievances against Godfrey, but one was not processed, and nothing resulted from the other. These allegations, *see* Compl. Compl ¶¶ 97–98; Compl. Exs. H1–H4 (Doc. 2-1 at 102–105), fail to allege facts showing that Defendant Swanson acted out of a retaliatory motive. An inmate's failure to achieve a result from a grievance process does not violate the Constitution.

### Paragraph 98

Warner returned to MSP in September 2021 and alleges that Godfrey resumed his course of retaliation. Godfrey placed him in the RHU "for no reason." Godfrey told Warner he was placed there "as a precaution" and would be locked up "any time something MIGHT occur in the prison, then 'we'll sort it out later.'" Warner's grievance was investigated. He states that he "did not receive a

28

disciplinary and was released from RHU days later." Compl ¶ 98; Compl. Ex. H4 (Doc. 2-1 at 105).

Neither Godfrey's reported statements nor Warner's placement in the RHU for a short period of time supports an inference of retaliation or discrimination or other constitutional violation.

**Paragraphs 99–101**

Warner alleges that, on three distinct occasions, his new clothing and shoes were taken, his cell was "destroyed" and his religious medallion and its chain were broken, and Defendant Wigert wrote him up "in an effort to have him removed from his job" and to send IPS into his cell again. Warner's exhibits show that he was reimbursed for his clothing, and his medallion was replaced. His complaint about Wigert was investigated and found to be unsupported. He was not removed from his job. *See* Compl. ¶¶ 99–101; Compl. Exs. H5–H7 (Doc. 2-1 at 106–08).

These allegations do not support an inference that anyone, including Wigert, retaliated against Warner. He does not explain why others should believe these actions reflected retaliatory intent or deliberate adverse action on someone's part or why they "did not reasonably advance a legitimate correctional goal," such as limiting the amount or type of his clothing. Warner also does not allege a "harm that is more than minimal." *See Rhodes*, 408 F.3d at 567–68 & n.11; *Al-Owhali*, 687 F.3d at 1240. And no defendant is identified as responsible for taking his

29

property or breaking his medallion.

### Paragraphs 102–103

Warner alleges that someone at MSP told someone outside MSP that he was a "gang leader," but he is not. These facts does not show a violation of the Constitution.

### Paragraph 103

Warner claims that a case manager told him Godfrey sent an email stating that "anyone can advance" out of RHU except Warner. If Warner can point to actions that violate the Constitution, he might proceed on this claim. A reported statement in an email does not violate the Constitution.

### Paragraphs 104–108

Warner contends that "[t]he property issue at MSP is absurdly unconstitutional." Compl. ¶ 104. He claims that a set of runes[3] he possessed at Crossroads in January 2019 "disappeared" at some point after he was transferred back to MSP, that he was deprived of another set of runes and requested a hearing but never received it, and that he was promised compensation for other property but never received it.

---

[3] When Warner says "runes," it is not clear what he means. The property taken from Warner on February 1, 2019, included three decks of cards. The religious property list refers to "rune cards (deck of runes)" rather than "runes." And Sergeant Coughlin confiscated "what appears to be game pieces" from Warner's cell at MSP in June 2019. *See* Compl. Exs. I1–I2, I8 (Doc. 2-1 at 110–11, 117).

Jail officials cannot deprive an inmate of property without due process of law or just compensation. To state the same guarantee a different way, a jail official does not deprive an inmate of due process unless the official first deprives the inmate of property that belongs to him. Warner's exhibits show that his grievances were denied because he had not purchased the runes from the canteen at MSP, so the officers had no proof he possessed them. *See* Compl. Exs. I3–I7 (Doc. 2-1 at 112–16). Warner's allegation that he possessed runes in January 2019 at Crossroads does not support an inference that someone at MSP deprived him of them. To the extent Warner believes someone did, he fails to allege facts showing that the deprivation was authorized by MSP policy.

Warner's tacit allegation that someone at MSP stole or destroyed his runes without complying with policy is similar to his allegation that he was promised compensation for some property but never received the money. *See* Compl. ¶¶ 107–108; Compl. Ex. I9 (Doc. 2-1 at 118).[4] In both instances, the Montana Tort Claims Act appears to provide an adequate post-deprivation remedy.

Finally, Warner alleges he requested a hearing but did not get one when (apparently different) runes were taken from him in June 2019. This allegation fairly states a claim for deprivation of due process.

---

[4]  The Court assumes that prison policy does not authorize anyone to agree to pay compensation but then fail to do so.

Exhibit I9 is barely legible, but it appears consistent with Warner's allegation.

Paragraphs 110–114[5]

Warner alleges that Defendants Godfrey, Salmonsen, Stefalo, and "others" refuse to accommodate Odinist practices and "go out of their way to encourage and even favor other religions." Compl. ¶ 110.  He contends that "only Native Americans are allowed to use" an outdoor fire pit; that inmates' electronic tablets hold and regularly add books and videos for people of all religions except Odinism; that measures taken over a roughly three-week period to allow Odinists to fast during the day and feast at night are inadequate as the food provided is often unhealthy and often too little or not received at all; and that sacred days are not observed sufficiently close in time to the actual days. Compl. ¶¶ 111–114.

To show a violation of the right to free exercise of religion, an inmate must allege facts showing that officers' actions substantially burden the practice of his religion. A "substantial" burden is one that tends to "coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jones v. Williams*, 791 F.3d 1023, 1031–32 (9th Cir. 2015). Even where there is a substantial burden, officers' actions are permissible if they are "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner*, 482 U.S.

---

[5] Paragraph 109 is addressed above with Paragraphs 71–73.

at 89). As with Warner's First Amendment claims concerning the mail, "*Iqbal* and *Turner* require an inmate to plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest." *Al-Owhali*, 687 F.3d at 1240 (internal quotation marks and citation omitted).

The Supreme Court recognizes that less familiar religions with fewer adherents stand at some disadvantage to mainstream religions in a prison environment. All inmates must have a "reasonable opportunity" to pursue their faiths, "comparable to the opportunity afforded fellow prisoners who adhere to the conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). Reasonable opportunities need not be identical opportunities. *See id.* n.2. Nor does the First Amendment require that inmates have the opportunity to engage in *every* form of exercise their religion prescribes. The First Amendment provides only that inmates cannot be deprived of substantially *all* religious exercise. *See, e.g.*, *O'Lone*, 482 U.S. at 351–52 (holding that prison policy preventing Muslim inmates from attending Jumu'ah did not violate the First Amendment because service had to take place at a specific but slightly different time each Friday, and because inmates had several other means of practicing their religion).

Warner does not allege facts showing that he asked to use the same fire pit Native Americans use and was told he could not use it because their use was

exclusive. The Court is not aware of any requirement that prison officials must make an equal (or even comparable) quantity of materials available to each religion. Again, they must simply provide inmates with reasonable, comparable opportunities to pursue their religions. Warner does not explain why his difficulties in accessing religious materials on the tablets were due to officers' policies or acts. He also does not allege facts showing that lack of electronic access to materials substantially burdened his ability to exercise his religion, especially as hard copies of important texts were apparently available (*see* Compl. Ex. J16 (Doc. 2-1 at 135)). *See, e.g.*, *Jones*, 791 F.3d at 1032–37.

The same is true of Warner's concerns about his nighttime feasts and the time scheduled for Odinists to observe certain sacred days. He does not allege facts connecting his problems with the nighttime feasts and sacred-day observations to acts or policies carried out by prison officials. He does not allege facts showing why he believes only Odinist religious exercise encountered these practical obstacles. And he does not explain how imperfect observation substantially burdens his ability to practice his religion.

### Paragraph 115

Warner alleges Defendant Cobban placed him in the maximum custody unit by implementing an "override" on his objective classification score. His allegations are conclusory. His exhibits show that the assault at Crossroads entered into his

34

score. *See* Compl. Ex. K1–K2 (Doc. 2-1 at 145–146). At any rate, this classification decision does not appear to meet the *Sandin* test.

### Paragraphs 116–119

The allegations in these paragraphs are conclusory. Warner does not explain who did (or failed to do) what, when, where, or for how long. He does not explain how a specific person's action or inaction violated his rights or how he was harmed as a result.

### Paragraph 120

Warner alleges that two officers used excessive force against him on January 3, 2019. He does not explain what he did and what they did, so the Court cannot draw the inference that the force was excessive (though it certainly sounds painful and unpleasant). Disagreeing with an inmate's view of a situation does not violate the Constitution. Warner does not explain what Defendants McTighe and Daugherty did or said or who denied him medical treatment or decontamination.

Additionally, when Warner filed his complaint, he had not yet exhausted his administrative remedies on this claim. *See* Compl. Exs. L1–L6 (Doc. 2-1 at 158–163). "No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see* also *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Booth v. Churner*,

35

532 U.S. 731, 739 (2001). "Exhaustion requirements apply based on when a plaintiff files the operative complaint." *Jackson v. Fong*, 870 F.3d 928, 935 (9th Cir. 2017).

### Paragraph 121

Inmates are entitled to food providing adequate nutrition, but it need not be "tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993). Warner alleges the food services contractor at Crossroads served substandard fare, including food marked "not for human consumption." He suffered weight loss, constipation, fatigue, and body aches at Crossroads. He states that he was denied medical attention and Defendants McTighe and Wolken would not look into his complaints.

If Warner intended to state a claim against Trinity Services, his allegations are conclusory. He must allege facts showing that the food available to him was not adequate to maintain his normal health. If Warner intends to hold McTighe and Wolken liable, he must explain what he wanted them to do and why they were required to do what he wanted. Warner's grievances also suggest this claim is time-barred. *See* Compl. Exs. M1–M6 (Doc. 2-1 at 165–170).

### Attachment N

The Court has connected some of the exhibits in Attachment N to Warner's allegations. But if Warner intended to make additional claims related to the

attachment, he must say what they are.

**D. Conclusion**

The Court understands that Warner is alleging an overarching conspiracy to retaliate against him because of his religious beliefs and his litigation activity. But he cannot proceed by simply saying that. He must allege facts that help a person who is not familiar with his situation to understand why he believes the actions he complains of are unreasonable and motivated by ill intent.

Accordingly, IT IS ORDERED:

1. Warner's motion to proceed in forma pauperis (Doc. 1) is GRANTED. A collection order accompanies this Order.

2. On or before **February 17, 2023,** Warner may file an amended complaint, <u>confined to the subject matter of the original complaint</u> and setting forth each claim on which he intends to proceed. He may not incorporate any part of another pleading or exhibits by reference. He may, however, cite to the exhibits already on file (e.g., "*see* Compl. Ex. N7"). The amended complaint will entirely supersede the original complaint.

DATED this 29th day of December, 2022.

_____
John Johnston
United States Magistrate Judge