IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DANNY LEE WARNER JR., | CV 22–08–H–DLC |
| Plaintiff, | |
| vs. | ORDER |
| DEMETRIC GODFREY, et al., | |
| Defendants. | |

Plaintiff Danny Lee Warner, Jr. ("Warner"), a state prisoner proceeding without counsel, filed a civil rights complaint under 42 U.S.C. § 1983. He asserts claims of: conspiracy, RLUIPA violations, retaliation, speech and free expression violations, religious claims, Eighth Amendment violations, as well as Fourteenth Amendment Violations, under both the Equal Protection and Due Process clauses. (Doc. 2.)

By way of background, Warner previously filed a lawsuit advancing similar allegations. *See, Warner v. Stefalo et al.*, Cause No. CV-10-03-GF-BMM-JTJ, Comp. (filed Jan. 25, 2019). There the Department of Corrections Defendants were dismissed pursuant to a stipulation filed by the parties. *Warner v. Stefalo et al.*, Cause No. CV-10-03-GF-BMM-JTJ, Ord. (D. Mont. Aug. 25, 2020). The remaining claims and defendants were subsequently dismissed as a sanction after it

1

was found that Warner filed documents for the improper purpose of deceiving the Court as to the nature of the factual records. *See, Warner v. Stefalo*, Cause No. CV-10-03-GF-BMM-JTJ, Ord. (D. Mont. March 17, 2021). The dismissal sanction was affirmed on appeal. *See, Warner v. Stefalo, et al.*, No. 21-35255, Mem. (9th Cir. Oct. 18, 2022).

Because Warner is a prisoner proceeding in forma pauperis, his Complaint required a pre-answer screening pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b). Magistrate Judge Johnson engaged in an extensive preliminary screening of the matter, pursuant to 28 U.S.C. §§1915(e)(2)(B)(ii), 1915A(a), (b)(1), and advised Warner of the deficiencies in his filing. *See generally*, (Doc. 9.) Warner ultimately responded by filing an Amended Complaint. *See*, (Doc. 15.)

Defendants were ordered to respond. *See,* (Doc. 19); 42 U.S.C. § 1997e(g)(2). The remaining State and CoreCivic Defendants seek dismissal of Warner's amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See e.g.*, (Docs. 26-29.) Warner opposes. (Docs. 50 & 51.) In the interim, this matter was reassigned to the undersigned. (Doc. 20.) Additionally, Defendant Trinity Services has appeared. (Doc. 59.)

Warner continues to take issue with the Magistrate Judge's preliminary screening order, *see e.g.*, (Doc. 50 at 18-20.) This *sua sponte* screening procedure

2

is cumulative of, and not a substitute for, any subsequent Rule 12(b)(6) motion that a defendant may later bring. *See Teahan v. Wilhelm*, 481 F. Supp. 2d 1115, 1119 (S.D. Cal. 2007); *see also, Lucas v. Jovanovich,* 2016 WL 3267332, at *3 (D. Mont. June 10, 2016). Moreover, Defendants are correct that Warner has failed to correct the underlying deficiencies with the filing of his amended complaint. Accordingly, the Defendants' respective motions to dismiss are granted.

## I.    LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block*, 250 F. 3d 729, 732 (9th Cir. 2001). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs must also, however, plead "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action, or conclusory allegations, or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F. 3d 1202, 1216 (9th Cir. 2011).

In determining whether a complaint states a claim to relief that is plausible

on its face, factual allegations are accepted as true and construed in the light most favorable to plaintiff. However, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Chavez v. United States*, 683 F. 3d 1102, 1108 (9th Cir. 2012)("a court discounts conclusory statements, which are not entitled to the presumption of truth, before determining whether a claim is plausible"). Moreover, the Court does not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See, Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001), amended by 275 F. 3d 1187 (2001).

Pro se litigants "must be ensured meaningful access to the courts." *Rand v. Rowland*, 154 F. 3d 952, 957 (9th Cir. 1998)(en banc). When a plaintiff is appearing pro se, the court must construe the pleadings liberally and afford the plaintiff any benefit of the doubt. *Hebbe v. Pliler*, 627 F. 3d 338, 342 (9th Cir. 2010). In giving liberal interpretation to a pro se complaint, the court is not permitted to "supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F. 2d 266, 268 (t9h Cir. 1982).

The determination of a Rule 12(b)(6) motion is limited to the pleadings except for documents attached to the complaint, documents incorporated by reference in the complaint, or matters subject to judicial notice. *Lee v. City of L.A.*,

4

250 F. 3d 668, 89 (9th Cir. 2001); Fed. R. Civ. P. 12(d).

## II.    FACTUAL ALLEGATIONS

Warner is presently serving a fifty-year prison sentence following his 2017 Robbery conviction, handed down in Montana's Eleventh Judicial District, Flathead County.  Warner was designated as a Persistent Felony Offender.

The following facts are taken from Warner's Amended Complaint, *see,* (Doc. 15), and, at this stage of the proceeding, are assumed to be true and construed in the light most favorable to him, *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1114 (9th Cir. 2021); *Soltysik v. Pakilla*, 910 F. 3d 438, 444 (9th Cir. 2018).  Warner also cites extensively to his exhibits to the amended complaint; accordingly, those items are also considered.  *Lee*, 250 F. 3d at 89.

In December of 2017, Warner arrived at Montana State Prison ("MSP"). From there he was transferred for an unidentified period of time to Dawson Correctional Facility, in Glendive, Montana, and then back to MSP.

Warner is a practicing Odinist.  In January of 2018, Warner made a Religious Accommodation Request to Terrie Stefalo ("Stefalo"), the Religious Activities Coordinator at MSP, asking that Odinists be provided their own outdoor sacred space; the request was denied.  (Doc. 15 at 9.)

Warner states that he has continuously been denied a gluten-free and medically necessary diet by MSP officials.  (Doc. 15 at 26-27.)  Warner grieved

the issue. On April 10, 2018, Warner's diet-related grievance was denied, but he was encouraged to see the doctor and work with the prison dietician.[1]

In June of 2018 Warner was transferred to Crossroad Correctional Center ("CCC"). Shortly after his arrival he was involved in a fight. He was ultimately found guilty of assault and sentenced to Max custody for six months. (*Id.* at 13-14.) Warner spent six months in administrative segregation and was then placed in High Security. (*Id.* at 14.) During this same time period, Warner claims both Demetric Godfrey ("Godfrey"), the Associate Warden of Security at MSP, and Patrick McTighe ("McTighe"), the former Warden of CCC, told him that Odinism would never be accommodated as long as they both held their respective positions. Warner was advised that if he continued to pursue his practice of Odinism, they would lock him up so that he could not practice his religion at all. (*Id.*)

Warner also claims he was denied a nutritionally sufficient diet by Trinity Services, a food contractor for CCC, during his "lockdown" in September and October of 2018, in violation of the Eight Amendment. *(Id.* at 39-40).[2]

In January of 2019, Warner was transferred back to MSP. Upon his transfer back, a set of wooden runes was taken from him. (Doc. 15 at 35.)[3] Warner's

---

[1] *See*, (Doc. 2-1 at 177-80.)
[2] *See also,* (*Id.* at 165-170.)
[3] *See also*, (Doc. 2-1 at 116).

6

grievance challenging the purportedly unlawful taking of his runes was denied.[4]

From 2019 to 2021 while at MSP, Warner spent a significant amount of time in the restricted housing unit ("RHU"). Warner claims that while in RHU he was denied clean clothes and linens. (Doc. 15 at 17.)

On February 5, 2019, Roxanne Wigert ("Wigert"), the Security Threat Group ("STG") Sergeant, confiscated a "religious" drawing of Warner's. (*Id*. at 15.) On February 14, Warner was found "not guilty" of an unidentified infraction, but states that his drawing was not returned to him. (*Id*.)

On February 17, 2019, Warner had a seizure in his RHU cell. He contends his treatment was delayed because there was not an emergency call button in the cell for him to utilize. (*Id*. at 17.)

On March 7, 2019, the air/ventilation system in the RHU cells stopped functioning and remained off for 2 months. (*Id*. at 17.) Also, in March, Warner states that he attempted to obtain programming and educational opportunities, but MSP lacked the corresponding resources to provide such. (*Id*. at 17-18.)

In May of 2019, Warner's grievance challenging the laundry issue was granted in part.[5]

---

[4] *Id*.

[5] *See*, (Doc. 2-1 at 176)(Warner informed that MSP officials were working on providing a sufficient number of clothing and linen items to inmates, but due to some inmates hoarding items or destroying items, there was a delay in laundering and replacement. MSP was taking measures to address the issue.)

On June 7, 2019, another set of runes was taken from Warner.  (*Id*. at 36.)[6] In July of 2019, Warner challenged MSP's procedure that allowed inmates to receive funds, books, and other materials only from approved individuals.  This grievance was ultimately denied in January of 2020.

In August of 2019, Warner alleges that MSP began returning his mail to friends, family, and Odinist organizations without the requisite notice to him. (Doc. 15 at 18.)

On September 5, 2019, Warner contacted Stefalo and Ray Hunt, a registered dietician at MSP, regarding meal accommodations for his upcoming Winter Nights Feast, which was set to occur between September 23rd and October 12th.[7]  Warner was informed that he would receive 3 dinner trays after sunset and that he would be given 60 minutes to eat and return the trays.[8]  Nonetheless, Warner later claimed he was not provided adequate food during the Winter Nights fast.  (Doc. 15 at 12.)

In October and December of 2019, Warner began grieving MSP mail policy 3.3.6.[9]  In January of 2020, Warner was informed that mail items which do not meet processing requirements upon inspection of the envelope, are returned sealed to the sender with a notification on the envelope of the reason for the return.[10]

---

[6] *See also*, (Doc. 2-1 at 177)(noting that the "runes" appeared to be game pieces and/or chess pieces).
[7] *See*, (Doc. 2-1 at 136.)
[8] (*Id*. at 137.)
[9] (Doc. 2-1 at 23, 26).  This policy is discussed further below.
[10] (Doc. 2-1 at 24-25.)

In January of 2020, Warner was transferred back to CCC.  Warner claims that the transfer was retaliatory in nature and that Godfrey advised him that while he had to let Warner out of "the hole," the transfer to CCC would ensure that Warner would be back before too long.  (Doc. 15 at 24-25.)  Godfrey apparently told Warner, "I told you I would find a way to fuck you, and this should do the trick since McTighe hates you."  (*Id*. at 25.)

On January 29, 2020, Warner was placed in RHU for exercising in the day room at CCC.  (*Id*. at 30.)  Shortly thereafter, in February of 2020, Warner was transferred back to MSP.  He finished serving his CCC disciplinary sentence at MSP.  Warner states he was not given the requisite process or a hearing at MSP.  On February 7, 2020, he was designated to the Max status program.  (Doc. 15 at 30.)  On that same day, MSP authorities placed Warner in a dirty cell that smelled of urine and vomit.  His request for cleaning supplies was denied.  (*Id*.)

On February 12, 2020, Warner handed classification and disciplinary appeals he had prepared to Godfrey, who responded by throwing them in the trash.  (*Id*.)  During this same time period, Warner claims Godfrey told Warner that he "did not like white people" and was going to "send [Warner] to the blackest prison he could find."  (Doc. 15 at 30).  Warner alleges, in relation to Godfrey's discriminatory threat, he was granted an investigation.[11]  Also, during this

---

[11] But these grievances reveal that Warner actually challenged a threat Godfrey allegedly made

timeframe, Warner apparently began a hunger strike, which he describes as a "peaceful protest." (*Id*. at 48.) On February 26, 2020, Godfrey, McNeil, and 15 other unidentified individuals came into Warner's RHU cell in an effort to threaten and intimidate him into ending his hunger strike. (Doc. 15 at 32.)

Warner generally alleges that MSP excludes Odinist texts from the inmates' electronic tables, despite including every other religion. In April of 2020, Warner was denied a copy of *March of the Titans: the Complete History of the White Race*.[12] The book was initially denied by Correctional Officer Foster on April 18, 2020. The decision was then sent to the MSP book committee for review; the initial denial was affirmed.

On April 21, 2020, Warner informed Stefalo that while the Poetic Edda, a primary Odinist text, was on the inmate tablets, the Prose Edda section was blank.[13] Stefalo advised Warner that she was informed the items were being replaced. Stefalo forwarded Warner's request about the tablets to Kristy Cobban.[14]

In September of 2020, Warner again grieved mail issues. On September 9, 2020, he was referred back to MSP Policy 3.3.6 and the basis upon which mail

---

on February 26, 2020, in an effort to intimidate Warner into ending his hunger strike. There is no allegation that Godfrey stated he "didn't like white people" or was going to send Warner to a certain type of prison. (Doc. 2-1 at 103-104).

[12] (Doc. 2-1 at 64-65.)

[13] (Doc. 2-1 at 130.)

[14] (Doc. 2-1 at 131.)

items could be returned to senders.[15]

Warner was subsequently transferred to a correctional facility in Terre Haute, Indiana, and apparently placed into custody of the Bureau of Prisons. Warner claims this transfer was made at Godfrey's behest. Warner states that unidentified officers at Terre Haute told him he did not belong there as the facility was for deviants; these same unidentified individuals alleged that Godfrey asked for Warner to be "taught a lesson" while there. (Doc. 15 at 31.) Warner states he was later assaulted at Godfrey's behest.

In June of 2021, Warner was transferred back to MSP. In July, Warner again sought to have Odinist material added back to the MSP tablets. Warner was advised content must be free source or that a release needed to be provided by the copyright holder in order to be placed on the tablet. Warner also was informed that he may provide source material for the tablets but would need to follow the appropriate procedure (MSP 3.3.10) to have the materials included.[16]

On July 7, 2021, Warner contacted Stefalo to inform her that he would again be observing Winter Nights Fast and Feast from September 22, 2021, to October 14, 2021. Warner was advised he would be accommodated.[17] Despite this, Warner claims he was not provided adequate food during his fast. (Doc. 15 at 12.)

---

[16] (Doc. 2-1 at 133-34.)
[17] (Doc. 2-1 at 140).

On September 28, 2021, Warner was placed in RHU, purportedly as "a precaution." (Doc. 15 at 34.) Warner states that during the transfer to RHU, his cell was searched and "destroyed." According to Warner, much of his personal property was ruined and/or thrown away and his religious medallion was damaged. (*Id*. at 34-35.)

In November of 2021, photos sent to Warner were returned to sender for being "sexually explicit." Warner claims MSP's mail policy violates the First Amendment as the definition of "sexually explicit" and "subjects who pose provocatively" is unnecessarily restrictive. (Doc. 15 at 20.)

During this same time frame, Warner also renewed his request for an outside sacred space with a firepit dedicated for the Odinists. (Doc. 15 at 9-10.)[18]

In November of 2021, Waner alleged he was denied adequate exercise, gym time, and recreation. (Doc. 15 at 38). Warner states that that lack of outdoor bathroom or drinking water in winter months at MSP further prevents adequate outside exercise. (*Id*.) Warner grieved the issue on November 21, 2021.[19] His grievance was denied, and Warner was informed that the outside water is turned off during winter months so that the pipes don't freeze.[20]

Warner was denied a copy of *Gods of The Blood: The Pagan Revival and*

---

[18] *See also*, (Doc. 2-1 at 125-26.)
[19] (Doc. 2-1 at 153.)
[20] (*Id*.)

*White Separatism*.  The initial denial was made by Correctional Officer Foster on November 29, 2021.[21]  The decision was forwarded to book committee for review, and the denial was affirmed. [22]

In December of 2021, Warner was not hired for a job in the high side gym. He asserts this was due to ongoing discrimination and to Wigert improperly designating him as a member of a security threat group ("STG"). (Doc. 15 at 37-8.)

In December of 2021, Warner provided Stefalo with the dates of all major Odinist blots for next year and requested that the celebration/observation occur on the exact calendar date.  Stefalo denied the request and advised Warner that Odinists have to adhere to same policies as every other religious group at MSP.[23]

On January 6, 2022, Warner's request for an outside space dedicated to Odinists was denied.  (Doc. 15 at 10.)  It was explained, "[j]ust as the inside of the Religious Activities Building is shared by multiple faith groups, the outside worship area is shared by those faith groups that are approved for outside religious activities."[24]

Warner was then transferred pursuant to an Interstate Corrections Compact ("ICC") Agreement to Ohio.  He is presently incarcerated at the Allen Oakwood

---

[21] (Doc. 2-1 at 71.)
[22] (*Id.*)
[23] (Doc. 2-1 at 141.)
[24] (Doc. 2-1 at 129.)

Correctional Institution in Lima, Ohio.  *See e.g.*, (Doc. 60.)

Warner alleges an overarching conspiracy of Defendants to retaliate against him, motivated by his religious beliefs and litigation activity.  The discrete claims against the separate actors will be discussed below.  Additional facts will be supplied where necessary.

**Relief Sought**

Warner seeks declaratory judgment that the acts described in his amended complaint violated his constitutional rights.  (Doc. 15 at 71.)  He also seeks extensive injunctive relief, including, but not limited to, a permanent order that Defendants:  cease discrimination and retaliation, not transfer him, remove and expunge his STG/assaultive designation, change MSP mail policies, fully accommodate all Odinist practices, provide high side inmates daily gym access, ensure year-round running water in the outside recreation yard, regularly provide clean clothes and bedding, provide adequate cleaning supplies, ensure heating and ventilation systems are adequate and functioning, install emergency call buttons in every RHU cell at MSP, offer educational and vocational opportunities at MSP, develop and follow proper disciplinary procedures at MSP in accordance with MCA §§ 53-30-800, et. seq, return all personal property to Warner that was taken upon his return from the Bureau of Prisons, retain independent ombudsman to investigate and resolve due process complaints at MSP and to resolve future

complaints of deprivations of due process, and that a special master be appointed to ensure implementation of any changes ordered by this Court.  (Doc. 15 at 71-73.)

It appears, however, that Warner's requests for injunctive relief are now moot, given his transfer to Ohio.  Generally, when a prisoner complains of unconstitutional conditions of confinement and is transferred to another facility, a claim for injunctive relief from those conditions becomes moot.  *Brady v. Smith*, 656 F. 2d 466, 468 (9th Cir. 1981); *Johnson v. Moore*, 948 F. 2d 517, 519 (9th Cir. 1990).

Warner also seeks nominal damages in the amount of $100 against every Defendant for each claim they are held liable, compensatory damages against each Defendant, jointly and severally, in the amount of $100,000; compensatory damages in the amount of $90 for the cost of Warner's MP3 player and the songs it contained and another $124.57 for the theft of money from his inmate account for "postage" and "fees" that he did not authorize.  (*Id*. at 73.)  He seeks punitive damages against each Defendant, jointly and severally, in the amount of $100,000, in addition to the costs he incurred during the course of this action.  (*Id*. at 74.)

## III.   ANALYSIS

Section 1983 confers a tort remedy upon individuals "whose constitutional rights have been violated by state officials acting 'under color of' law."  *Whalen v.*

15

*McMullen*, 907 F.3d 1139, 1145 (9th Cir. 2018) (quoting 42 U.S.C. § 1983).

Consistently, "[t]o state a claim under § 1983, a plaintiff must allege two essential

elements: (1) that a right secured by the Constitution or laws of the United States

was violated, and (2) that the alleged violation was committed by a person acting

under the color of State law."  *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134,

1144 (9th Cir. 2021) (internal quotation marks omitted).

42 U.S.C. §1985(3) prohibits conspiracies to deprive "any person…the equal

protection of the laws, or of equal privileges and immunities under the laws."  To

prevail on a cause of action under §1985(3), a plaintiff must allege and prove the

following:

> (1) A conspiracy; (2) for the purpose of depriving, either directly or
> indirectly, any person or class of persons of equal protection of the laws,
> or of equal privileges and immunities under the laws; and (3) an act in
> furtherance of this conspiracy; (4) whereby a person is either injured in
> his person or property or deprived of any right or privilege of a citizen of
> the United States.

*Sever v. Alaska Pulp Corp.*, 978 F. 2d 1529, 1536 (9th Cir. 1992), *citing United*

*Brotherhood of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 828-29

(1983)).

### A.     RLUIPA

The Religious Land Use and Institutionalized Persons Act of 2000

("RLUIPA") provides that "no government shall impose a substantial burden on

the religious exercise of a person residing in or confined to an institution" unless

the government shows that the burden furthers "a compelling government interest" by "the least intrusive means" available.  42 U.S.C. §2000cc-1(a).  RLUIPA does not authorize money damages against state officials, regardless of whether they are sued in their official or individual capacities.  *See, Jones v. Williams*, 791 F. 3d 1023, 1031 (9th Cir. 2015).  The only relief a prisoner may obtain under RLUIPA is injunctive relief but if incarcerated at a different facility or released, claims for injunctive relief are generally mooted.  *Id.*, *see also Dilley v. Gunn*, 64 F. 3d 1365, 1368 (9th Cir. 1995); *Walker v. Beard*, 789 F. 3d 1125, 1132 (9th Cir. 2015); *Pinson v. Carvajal*, 69 F. 4th 1059, 1064 (9th Cir. 2023).

Defendants assert Warner's claims under RLUIPA are now moot because he has been transferred out of Montana and to a facility in Ohio under the ICC. (Doc. 27 at 15-16.)  Warner responds that under the ICC, he will eventually be transferred back to Montana and that resolution of the RLUIPA claims is necessary to avoid future litigation.  (Doc. 15 at 2); (Doc. 50 at 14-16.)  Defendants point out that Warner's argument regarding his potential return to Montana and fear of renewed and/or repeated RLUIPA violations is unconvincing as he affirmatively pled in a companion civil rights matter in Ohio that he was able to effectively practice his Odinism while he was incarcerated in Montana.  *See*, (Doc. 55 at 11-12)(*citing Warner v. Chambers-Smith*, 2:24-cv-015650MHW-KAJ, Doc. 1-1 at 37, ¶207).

It is undisputed that Warner is no longer in custody in Montana.  Thus, declaratory and injunctive relief cannot affect defendants' present treatment of him.  There is an exception to the mootness doctrine following transfer pursuant to the "capable of repetition, yet evading review" exception, *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911), whereby a prisoner suit against an institution may still proceed, despite the prisoner's transfer, so long as he "demonstrate[s] 'a reasonable expectation that he [would be]…subjected again' to the [challenged] policies." *Walker*, 789 F. 3d at 1132 (*quoting Dilley*, 64 F. 3d at 1368-69).  A case is "capable of repetition, yet evading review" when "(1) the challenged action is too short in duration to be fully litigated prior to its expiration" and "(2) there is a reasonable expectation that the injury will occur again." *Dilley*, 64 F. 3d at 1368.

Warner's conclusory statement that he will eventually be transferred back to Montana at some point during the 50-year sentence he is serving is "too speculative" to prevent mootness.  *Walker*, 789 F. 3d at 1132; s*ee also Pinson*, 69 F. 4th at 1064.  A mere possibility is not sufficient. *Preiser v. Newkirk*, 422 U.S. 395, 402-03 (1975).  Moreover, there is no indication that even if Warner is returned to a Montana facility, he will face the same purported religious policies.  And even if he did, there is no indication that the duration of such future placement would be too short to allow his complaints to be litigated at that time.  *See e.g.,*

*Warner v. Patterson*, 543 Fed. Appx. 785, 788-89 (10th Cir. 2013). Accordingly, Warner is not entitled to relief under RLUIPA, and these claims are dismissed.

**B.      Religion Claims**

[T]he Free Exercise Clause…requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005); *see also,* U.S. Const. amend. I.

Despite incarceration, prisoners retain their First Amendment rights, including the right to free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Incarceration itself, as well as legitimate correctional goals or security concerns, may limit free religious practice, however. *Id*. at 348; *McElyea v. Babbitt*, 833 F. 2d 196, 197 (9th Cir. 1987)("The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security").

"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The governmental objective must be legitimate and neutral, and the prison regulations restricting inmates' First Amendment rights should operate in a neutral fashion, without regard to the

content of the expression. *Id*. at 89-90; *Pell v. Procunier*, 417 U.S. 817, 828 (1974); *Bell v. Wolfish*, 441 U.S. 520, 551 (1979). Legitimate penological interests include "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Procunier v. Martinez*, 416 U.S. 396, 412 91974)(overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989)).

When considering the reasonableness of prison policy, "[p]rison officials are experts in running prisons…and courts should respect that expertise." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Because the "problems of prisons in America are complex and intractable," and courts are particularly "ill equipped" to deal with these problems, courts generally defer to the judgments of prison officials in upholding regulations against constitutional challenge. *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). Therefore, courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Banks*, 548 U.S. 521, 528 (2006)(internal quotation marks and citation omitted).

To implicate the Free Exercise Clause, a prisoner must establish his belief is both sincerely held and rooted in religious belief. For purposes of the instant proceedings, the Court accepts that Warner's belief in Odinism is sincerely held.

To establish a free-exercise violation, plaintiff must show that prison regulations or actions substantially burdened their exercise of their religion by

preventing their engaging in conduct or having a religious experience required by their faith. *Hartmann v. Cal. dept. of Corr. & Rehab.*, 707 F. 3d 1114, 1122-24 (9th Cir. 2013). A "substantial" burden is one that tends to "coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior or violate his beliefs." *Jones v. Williams*, 791 F. 3d 1023, 1031-32 (9th Cir. 2015); *see also, Shakur v. Schriro*, 514 F. 3d 878, 884-85 (9th Cir. 2008).

Once a substantial burden is shown, *Turner* sets forth four factors that are relevant in determining whether a prison regulation impermissibly infringes on an inmates' constitutional rights"

> (1) Whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forth to justify it;
> (2) Whether there are alternative means of exercising the right that remain open to prison inmates;
> (3) Whether accommodation of the asserted constitutional right will impact…the guards and other inmates, and on the allocation of prison resources generally; and
> (4) Whether there is an absence of ready alternatives versus the existence of obvious, easy alternatives.

*Turner*, 482 U.S. at 89-90 (internal quotations omitted).

As a preliminary matter, this Court takes judicial notice of Warner's Complaint filed in *Warner v. Chambers-Smith*, 2:24-cv-015650MHW-KAJ, Comp. (Doc. 1-1)(filed April 4, 2024). *See, Tigueros v. Adams*, 658 F. 3d 983, 987 (9th Cir. 2011)(court may take judicial notice of proceedings in other courts, within and

21

without the federal judicial system, if those proceedings have a direct relation to the matters at issue).   There Warner advanced a religious accommodations claim, alleging that Ohio authorities had:

> continuously and consistently forced [Warner] to act contrary to his sincerely held religious beliefs, exerting substantial pressure on him to modify his behavior, by refusing him any means by which to actually practice his religion; this becomes all the more significant when this Court considers that [Warner] received religious accommodations in Montana and is entitled to the same in Ohio as a matter of law.

(*Id*. at 14.)  Warner went on to explain that he had been approved in Montana for observing the Winter Nights and had been appropriately accommodated. Specifically, Warner cited to copies of two Montana Offender/Staff Request Forms ("OSR").[25]  Notably, these same OSR's are attached to and referenced in Warner's complaints, in support of an argument that MSP officials did not  adequately accommodate Warner during his Winter Nights fast.  *See e.g.*, (Doc. 2 at 15); *see also*, (Doc. 2-1 at 136, 140.)  It appears Warner's own documents show that while at MSP, his ability to observe the Winter Nights fast was not substantially burdened by prison officials.  Thus, Warner was accommodated by Defendants

---

[25] The first OSR, from September 5, 2019, in which Warner sought accommodation from Stefalo, who forwarded the request to Ray Hunt.  Hunt, in turn, informed Warner: "Mr. Warner, we will supply you with the evening meal from our regular menu plus 2 sack lunches to eat after sunset during each day of your fast/feast."  In a second OSR, Stefalo advised Warner in July of 2021, that she was aware Warner would be participating in the Winter Nights Fest and Feast from September 22 through October 14, 2021, and that "[a]t the conclusion of each night's fast at sunset, you will receive 3 hot meals."  (*Id*. at 16-17)(citing Doc. 1-3 at 11-12).

while incarcerated in Montana and his First Amendment right to practice his religion was not violated.

Warner's additional free exercise claims suffer from the same defect- he has not alleged facts to show that Defendants' actions or regulations substantially burdened the practice of his religion.  Accordingly, the Court need not proceed to analyze the *Turner* factors as Warner has not sufficiently pled a substantial burden. Each claim will be addressed in turn.

### •**Fire Pit**

Warner claims the Odinists were denied a dedicated fire pit at MSP, but Stefalo informed him on separate occasions, in 2018[26] and 2022, that while the request was considered, the prison's Religious Activities Center had a neutral common outside worship space available for use by all faith groups to hold outdoor services.  *See e.g.*, (Doc. 2-1 at 122, 129.) Moreover, Odinists had been approved to use the outside space and had done so in the past.   (*Id*. at 122, 124.)  Thus, Warner has not sufficiently alleged that he was substantially deprived of all religious exercise under the First Amendment as related to observation of outdoor services utilizing the fire pit.  *See, Shakur*, 514 F. 3d at 884.

---

[26] MSP Defendants argue that Warner's claim relative to 2018 firepit use is time-barred.  The Court agrees. *See*, Statute of Limitations discussion below at Section G.

·**Blot Observation**

Warner's claim that he was burdened by not observing Blot on the corresponding calendar day also suffers.  As set forth above, Warner represented in proceedings in an Ohio federal court that he was, in fact, allowed to effectively observe his religious holidays, including Blot, while incarcerated in Montana. *Warner v. Chambers-Smith*, 2:24-cv-015650MHW-KAJ, Comp. (Doc. 1-1 at 14). As evidenced by the attachments to his complaint, in December of 2021, Warner provided Stefalo with 22 dates outlining all of the major Blots in the upcoming year. (Doc. 2-1 at 141-42.)  Stefalo informed Warner that all of the dates could not be accommodated and that just as "every other communal faith group" was required to do,  the Odinists could observe their holidays closest to their scheduled service day.   (*Id*. at 141.)  Stefalo explained that there is "not enough space, time, or staff to accommodate every communal faith group's request to celebrate holidays on their specific dates." (*Id*.)

Warner does not allege facts explaining when or how he believes he and/or Odinists were treated differently or burdened in practicing their Blot.  To the contrary, Warner's own exhibits suggests Odinists were treated in the same manner as the other faith groups at MSP.  Moreover, the exhibits reveal that MSP's practice was an "incidental effect" of prison life which precluded some of the Blots having an observation date that was not preferred, but there is no allegation that

24

would establish Warner was coerced to act contrary to his religious belief. *See e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988).

### ·Electronic Tablet, "Religious" Drawing, and Runes

Warner's claim regarding a lack of Odinist materials on the electronic tablets also fails. Warner simply concludes this constituted a substantial burden, but he provides no factual allegations regarding how his religious practice was burdened. Not only did MSP staff respond to Warner's requests in an attempt to upload the requested Odinist materials to the tablets, but Warner was also provided hard copies of the materials he sought, the Prose Edda and Poetic Edda, while the tablets were being updated. *See*, (Doc. 2-1 at 130-135). There are no facts alleged that demonstrate substantial pressure was placed upon Warner to modify or violate his beliefs resulting from the tablets. *Jones*, 791 F. 3d at 1031-32. Rather, Warner's own exhibits suggest he was adequately accommodated.

Similarly, Warner does not allege any facts surrounding the taking of a drawing, purportedly religious in nature, or the taking of his runes, from which this Court could infer that a substantial burden was placed upon his religion. Warner simply provides his own conclusory statement, which is insufficient at this stage of the proceedings. *Iqbal*, 556 U.S. at 678.

25

**Letters**

Warner alleges that in late 2019 Odinist letters of his "disappeared."  As

pointed out by Defendants, Warner does not explain the nature or content of these

letters, who was responsible for the purported disappearance, or how his religious

practice was burdened as a result of the disappearance.  Moreover, Warner does

not allege how he knows of the disappearance.  Simply because he did not receive

a response to his correspondence does not adequately allege that the Defendants

made the letters "disappear," much less support a viable constitutional violation

relative to the practice of his religion.  Warner has not adequately stated a claim.

**Religious Medallion**

Finally, Warner alleges that destruction of his religious medallion in

September of 2021, a Valknot pendant, constitutes a free exercise violation.

Apparently the chain on the pendant was broken during a cell search following

Warner's transfer to the Restricted Housing Unit of MSP. Warner does not allege

any additional facts in support of the claim.  Moreover, his exhibits show that the

pendant was replaced by MSP authorities following Warner's filing of an Informal

Resolution Form.  *See*, (Doc. 2-1 at 107.)  Warner has not adequately alleged facts

to show that temporary deprivation of the item prevented him from engaging in

religious conduct. *Hartman*, 707 F. 3d at 1122-24.  These claims will all be

dismissed.

To the extent that Warner recasts his religion claims as conspiracy claims, alleging MSP officials conspired to violate his right to religious exercise under the First Amendment, *see* (Doc. 15 at 44, referencing ¶¶39-43, 49, 52), the conspiracy claims also fail.  As explained herein, Warner has failed to allege facts to support the existence of a constitutional violation.  As set forth above, to prove a civil conspiracy, Warner must show that the conspiring parties reached a unity of purpose or common design and understanding, or a meeting of the minds, in an unlawful arrangement.  *See Gilbrook v. City of Westminster*, 177 F. 3d 839, 856 (9th Cir. 1999).

Warner alleges that Godfrey and Stefalo conspired to deny an outdoor sacred space/firepit dedicated to Odinist use.  (Doc. 15 at 44.)  But in the facts set out in support of this claim, Warner simply states that a separate fire pit was denied by Stefalo and Godfrey, without cause or justification.  (*Id*. at 9.)  The remainder of the paragraphs relating to this claim refer solely to Stefalo.  Thus, there is no agreement between Stefalo or Godfrey alleged, nor any facts to support a finding that the two shared a common design and understanding. (*Id*.)  Similarly, Warner states Stefalo and Godfrey conspired to prevent him from observing Blot on the holy day of solar significance, but he provides no additional context as to when these purported deprivations occurred, nor does he allege any facts from which one could find that that there was some kind of agreement between Stefalo and

Godfrey, or that they shared a common objective to frustrate Warner's religious practice. *See e.g.*, (*Id*. at 12.)  Moreover, Warner has alleged in separate proceedings that his religious practices, including Blot observation, were accommodated in Montana.

Warner alleges that Godfrey, Cobban, and Stefalo conspired and refused to place Odinist materials on MSP's tablets.  Warner claims that they did this, despite Warner offering to acquire religious materials for MSP tablets.  Aside from these general allegations, no specific facts are alleged in support of the claim.  A review of the exhibits referenced by Warner shows that in April of 2020, Warner filed an OSR to advise Stefalo that the Prose Edda site on the tablet was blank; Warner was informed that the document was in the process of being replaced.  *See*, (Doc. 2-1 at 130.)  The OSR was forwarded by Stefalo to Kristy Cobban, as she was the person designated to deal with technological issues.  In May of 2020, the issues with the the Norse Sacred Text material on the tablets was reported for correction.[27]  In the interim, Warner was provided with hard copies of the documents he wished to access and was also advised by Stefalo that she had located an elder priestess in Nordic Pagan traditions who was willing to have a clergy visit with Warner over the phone.  (*Id*. at 131, 135.)

When the issue persisted with the tablets, it was again referred to the

---

[27] (Doc. 2-1. at 132.)

28

appropriate parties for correction and Warner was advised of the proper steps to take if he wished to have new material added to the tablets.  (*Id.* at 132-35.) Warner took issue with the fact that the Poetic Edda and Prose Edda were not in preferred format, and one would have to flip through each page to get to them. (Doc. 2-1. at 135.)  Stefalo explained that the formatting could not be edited at that time due to the source material.  But Warner was advised that new material could be added when it became available.  Stefalo reminded Warner that he had been given hard copies of the documents at issue.  (Doc. 2-1 at 135.)

Warner alleges no facts, nor does he refer to exhibits involving Godfrey. Further, it appears from his own exhibits that Defendants attempted to accommodate Warner's requests and also provided him with physical copies of documents whose format was incompatible with the tablets.  Importantly, Warner has not supplied facts regarding the acts of Godfrey, Cobban, and Stefalo from which this Court could infer a "meeting of the minds" required to state a §1985(3) claim.  *See, Gilbrook*, 177 F. 3d at 856.

Warner then attempts to recast these same religion and conspiracy claims as equal protection claims.  *See*, (Doc. 15 at 62-65.)  He reiterates his arguments surrounding the outdoor firepit, Blot observation, his religious drawing, rune possession, Odinist letters, and destruction of his religious medallion, but then states that these purported deprivations, which he believes to be based upon his

29

race and religion, violated his right to Equal protection under the Fourteenth Amendment. (*Id.*) But these claims must also fail. Not only has Warner stated that his religious practice was accommodated in Montana, but he has also failed to allege facts to support an inference that he was intentionally treated differently from similarly situated inmates. *See, Thornton v. City of St. Helens*, 425 F. 3d 1158, 1166-67 (9ᵗʰ Cir. 2005).

## C.   Property Claims

Warner alleges he was wrongfully deprived of property by MSP Defendants in several instances, including the taking of his wooden runes, (Doc. 15 at 55), and the destruction of his religious medallion. (*Id.* at 56.) Warner did not respond to the arguments supporting dismissal advanced by MSP Defendants in his reply. *See generally*, (Doc. 50.)

Prisoners have a protected interest in their personal property. *Hansen v. May*, 502 F.2d 728, 730 (9th Cir. 1974). An authorized, intentional deprivation of property (one carried out pursuant to established state procedures) is actionable under the Due Process Clause. *Hudson v. Palmer*, 468 U.S. 517, 532, n. 13 (1984) (*citing Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)); *Piatt v. McDougall*, 773 F.2d 1032, 1036 (9th Cir. 1985). On the other hand, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the

30

Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533.  The Montana Tort Claims Act, Mont. Code Ann. §§ 2–9–101, et seq., provides an adequate post-deprivation remedy. *See*, e.g., Mont. Code Ann. § 2–9–101(1) (2021).  Additionally, "the Due Process Clause is [ ] not implicated by a negligent act of an official causing unintended loss of or injury to...property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

At the outset, the Court notes that Warner was provided with a replacement medallion.  It matters not, however, because at most Warner has alleged an unauthorized intentional deprivation of property by Defendants.  Assuming he lawfully possessed the runes, the medallion, and other personal property, whether the denial and withholding of the items was intentionally done or negligently done by Defendants, it is undisputed that it was unauthorized and as such unactionable in federal court.  Warner's remedy lies with the adequate post-deprivation remedy provided by the Montana Tort Claims Act.  *See Barnett v. Centoni,* 31 F.3d 813, 816–17 (9th Cir.1994) (per curiam) (negligent or intentional unauthorized deprivation of a prisoner's property fails to state a claim if the state has an adequate post-deprivation remedy, which Montana provides). The property claims will be dismissed.

### D.    Eighth Amendment Claims

The treatment a prisoner receives in prison and the conditions of his

confinement is subject to review under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Prison officials "must provide humane conditions of confinement," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), and "may violate an inmate's Eighth Amendment rights when they deprive him of a single identifiable human need such as food, warmth, or exercise." *Thomas v. Ponder*, 611 F. 3d 1144, 1151 (9th Cir. 2010)(internal citations and quotation marks omitted); *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991). To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety. *Farmer*, 511 U.S. at 847. This requires a prisoner to demonstrate (1) the existence of an objectively serious risk of harm, and (2) that subjectively, prison officials knew of and disregarded that risk. *Farmer*, 511 U.S. at 834, 847.

### ·Clothing, Linens, Ventilation, Call Buttons

Warner alleges that at various times from February 1, 2019, to July of 2021, he was consistently denied clean clothing while in RHU. Warner states during one unspecified 6-week period, he only received clean socks five times, a clean towel eight times, clean linens twice, and had to once wait three weeks for a clean pair of socks. (Doc. 15 at 17.) Warner also claims that in March of 2019, the air/ventilation system in the RHU cells was not functioning for a two-month period. (*Id*.) Warner faults Salmonsen and Guyer for these purportedly cruel and

32

unusual conditions of confinement.  (Doc. 15 at 60.)

Warner states that on February 17, 2019, he had a seizure and could not get medical attention for several hours.  He states this was due to the lack of an emergency call button in his cell.  (*Id*.)  Warner believes Guyer exhibited deliberate indifference to his serious medical need by not having emergency call buttons in the RHU cells.  (*Id*. at 61,)

To establish a violation of the Eighth Amendment, a prisoner must show that he was objectively deprived of something "sufficiently serious."  *Farmer*, 511 U.S. at 834.  A deprivation is sufficiently serious when the prison official's act or omissions results "in the denial of 'the minimal civilized measure of life's necessities.'"  *Id*., *quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Next, the prisoner must show that the deprivation occurred as a result of deliberate indifference to the inmate's health or safety; this determination is premised on an assessment of the prison official's subjective state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).

A prison official who knows of and disregards an excessive risk to the inmate's health or safety demonstrate deliberate indifference.  *Farmer*, 511 U.S. at 837.  Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  *Id*.  However, an official that knows of a substantial risk to an

33

inmate's health or safety but acts reasonably under the circumstances will not be held liable under the cruel and unusual punishment clause, even if the threatened harm results. *Id*. at 843.

In his amended complaint, Warner does not explain what harm he suffered from a lack of clean clothing/linens or from the ventilation system, much less that the harm was "sufficiently serious." Moreover, aside from naming Salmonsen and Guyer, he provides no factual allegations that either individual knew of an excessive risk to Warner's health and/or that such risk was disregarded. *See, Farmer,* 511 U.S. at 837. Thus, Warner fails to adequately allege a claim of deliberate indifference.

Similarly, aside from a brief delay in response time to his medical issue, Warner does not allege that he was harmed. Although Warner states Guyer advised him following February 17, 2019, that emergency call buttons were not required in the RHU cells, Warner has not supplied facts from which one could infer that Guyer was aware that the lack of call buttons in RHU posed a substantial risk of serious harm and that he subjectively disregarded the risk. *Farmer*, 511 U.S. at 834, 847. These claims will be dismissed.

### Montana Code Annotated §§ 53-30-700 et seq.

Warner alleges Defendants violated state law, Mont. Code Ann. §§ 53-30-

700 et seq,[28] by placing him in RHU, failing to adequately monitor Warner while in RHU, and failing to follow the procedures outlined by state law.   (Doc. 15 at 16, 23-24, 27-28.)  As previously advised by Judge Johnston, simply violating state law or policy does not support a claim under 42 U.S.C. §1983.  Warner was instructed that he would need to explain why he believes he was entitled to the enforcement of state law or why the failure to implement the changes allegedly required under state law imposed a significant hardship upon him.  *See*, (Doc. 9 at 22-23.)  Warner has not adequately done so.

Section 1983 does not provide a cause of action for alleged violations of state law. *See, Ove v. Gwinn*, 264 F. 3d 817, 824 (9th Cir. 2001). "To establish a civil rights claim under 42 U.S.C. §1983, a plaintiff must assert more than a violation of state tort law- he must show that the defendant deprived him of an interest protected by the Constitution or federal law." *Weiner v. San Diego Cnty.*, 210 F. 3d 1025, 1032 (9th Cir. 2000); *Ybarra v. Bastian*, 647 F. 2d 891, 892 (9th Cir. 1981)("Only federal rights, privileges, or immunities are protected by the section.  Violations of state law alone are insufficient.")  Warner makes passing reference to the Eighth and Fourteenth Amendments, *see* (Doc. 15 at 28), but

---

[28] Sections 53-30-701 through 53-30-724, which were adopted as a result of Montana House Bill 763, discussed below, pertain to restrictive housing within Montana correctional facilities.  The code establishes policies, definitions, and requirements for the use of solitary confinement, administrative segregation, and protective custody, among other provisions pertaining to prisoners.

provides no legal basis supporting a theory that the state law at issue created an actionable cause of action in this matter.  Without more, this Court lacks subject matter jurisdiction over the claims.

Similarly, Warner's unsupported claim that he was entitled to educational or rehabilitative opportunities under state law, does not state a viable federal claim under Section 1983.  As he was previously advised, the federal Constitution does not confer entitlement to rehabilitation or educational opportunities.  (Doc. 9 at 15-16)(*citing Coakley v. Murphy*, 884 F. 2d 1218, 1221 (9th Cir. 1989); *Rizzo v. Dawson*, 778 F. 2d 527, 531 (9th Cir. 1985); *Hoptowit v. Ray*, 682 F. 2d 1237, 1254-55 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)).  These claims will be dismissed.

### RHU Placement

Warner alleges that upon his transfer back to MSP on February 4, 2020, he was placed in RHU.  Although Warner does not state how long he spent in RHU, he states it was an "indeterminate" amount of time during which he did not have his personal and legal property or life's basic necessities.  (Doc. 15 at 29.)  Warner states Godfrey is responsible for his excessive confinement for time spent in RHU after February 5, 2020.  (*Id*. at 60.)  But Warner's own exhibits suggest that he was placed in Max Status during this time frame as a result of his own conduct and was informed by Cynthia Wolken, the Deputy Director of the Montana Department of

36

Corrections, that he would need to "work through the level system" to gain corresponding privileges. *See e.g.*, (Doc. 2-1at 174-75.)

Warner alleges he was again placed in RHU on September 28, 2021, by Godfrey without valid reason, but instead he was locked up "as a precaution." (*Id*. at 15.)  When he grieved this matter, Warner was granted an investigation, although he suggests no meaningful investigation occurred and no changes were made.  (*Id*.); *see also*, (Doc. 2-1 at 105.)  Warner asserts Godfrey "falsely imprisoned him" in violation of the Eighth Amendment.  (Doc. 15 at 61.)

The Eighth Amendment "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency…'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  Conditions of confinement, however, may be harsh and restrictive without violating the Eighth Amendment.  *See, Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)("To the extent that…conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society").  Whether the conditions of confinement violate a prisoner's constitutional rights depends on the circumstances, nature, and duration of the conditions at issue. *Hearns v. Terhune*, 413 F. 3d 1036, 1042 (9th Cir. 2005)(citation omitted).

Here, Warner has not adequately alleged that he was deprived of the minimal civilized measure of life's necessities due to Godfrey's conduct.  It is unclear how much time Warner spent in RHU.  Judge Johnston previously noted

37

that Warner may have been placed in RHU in February 2020 for 8 days. *See*, (Doc. 9 at 25-6.) Similarly, in September of 2021, it appears the stay was relatively short. (*Id*. at 29.)

In his amended complaint Warner supplies no additional factual information as to the duration, but it appears to have been limited. The 2020 RHU stay was for Warner to complete a disciplinary sanction imposed at CCC upon his transfer to MSP, *see* (Doc. 15 at 29), and, according to Warner, the RHU term in 2021 was "precautionary" in nature. (Doc. 2-1 at 105). However, in either instance "the transfer of an inmate to a less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). The mere placement in RHU is insufficient for an Eighth Amendment claim. Moreover, there is nothing alleged to infer that Warner's conditions of confinement rose to the level of cruel and unusual punishment for the purposes of the Eighth Amendment. *See e.g., Andeson v. County of Kern*, 45 F. 3d 1310, 1315-16 99th Cir. 1995); *Toussaint v. Yockey*, 722 F. 2d 1490, 1494 n. 6 (9th Cir. 1984)("an indeterminate sentence to punitive isolation does not without more constitute cruel and unusual punishment"). Accordingly, Warner's Eighth Amendment claims based upon confinement in RHU will be dismissed.

38

**Exercise and Outdoor Access**

Warner generally alleges that he was denied adequate gym and outside recreation while in the restricted housing units.  (Doc. 15 at 38.)  He also states that during the winter months he was effectively denied outdoor recreation as there were no outdoor water or bathroom facilities available for use. (*Id*. at 23, 61); *see also,* (Doc. 2-1 at 153.)

The right to outdoor exercise is not absolute or indefeasible, *Norwood v. Vance*, 591 F. 3d 1062, 1068 (9th Cir. 2010), but "ordinarily the lack of outside exercise for extended periods is a sufficiently serious deprivation" for Eight Amendment purposes.  *LeMarie, v. Maass*, 12 F. 3d 1444, 1457 (9th Cir. 1993).  "'[T]he Constitution requires jail officials to provide outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates.'" *Norbert v. City and County of San Francisco*, 10 F. 4th 918, 931 (9th Cir. 2021)(*quoting Shorter v. Baca*, 895 F. 3d 1176, 1185 (9th Cir. 2018); *see also Cardenas-Ornelas v. Johnson*, __ F. 4th __, 2026 WL 234899, at *4 (9th Cir. Jan. 29, 2026)(holding that by 2020, case law had clearly established a prisoner's Eight Amendment right to outdoor exercise or meaningful opportunities for recreation).  Indoor recreational opportunities may satisfy constitutional standards.  *Norbert*, 10 F. 4th at 929-30.  Access to a dayroom designed for exercise may be adequate recreation. *Id*. at 931.

Warner does not explain the time period or duration of when the alleged denial of recreation time occurred.  He does note that while in general population he averaged one gym and one outside recreation period per week over the 3-month period preceding the filing of his amended complaint, while inmates in restricted housing units get two hours outside and on hour out of cell in the day room each day.  (Doc. 15 at 38.)  As Warner's amended complaint was filed in February, it appears that he is mainly taking issue with the lack of outdoor bathroom facilities purportedly curtailing his outside recreation.  Warner grieved this issue in January of 2022 and was advised that there is no access to drinking water or bathroom facilities outside during winter as the pipes are turned off to prevent freezing. (Doc. 2-1 at 153.)  This is a legitimate penological interest.  While Warner may have chosen not to go outdoors in the winter months, he does not allege that he was denied all recreational opportunities, which would include access to a dayroom. Thus, he failed to allege a sufficiently serious  or meaningful deprivation under the Eight Amendment.  *Norbert*, 10 F. 4th 931.

·**Unsanitary Cell and Denial of Cleaning Supplies**

Finally, Warner alleges that he was placed in an unsanitary cell on February 7, 2020, and that he was denied supplies to clean it. (Doc. 15 at 30, 62.)  Warner suggests that Godfrey, Winner, and Walls were responsible for this purported violation, but he provides no additional factual detail, including the length of time

he was in the cell, except to suggest he may have contracted a skin rash as a result. His exhibits show he was scheduled to see a medical provider regarding possible exposure to blood and/or feces, but there is no more explanation of Warner's injury. Similarly, Warner was apparently informed that the infirmary does not provide cleaning supplies, but that he was to make cleaning requests to his housing unit. (Doc. 2-1 at 97-98.) Defendants assert that Warner's reference to his alleged "viral skin disease/infection" is not supported by his own exhibits; the Court agrees.

Warner's allegations in his amended complaint do not support a claim that any of the named Defendants acted with deliberate indifference to a substantial risk of harm to Warner's health or safety with his temporary placement in an unsanitary and unpleasant cell. *See, Farmer*, 511 U.S. at 847.

For the reasons explained herein, all of Warner's Eighth Amendment claims will be dismissed. To the extent that Warner attempts to recharacterize his Eighth Amendment claims as Equal Protection claims, *see* (Doc. 15 at 65-65), the claims also fail. Aside from his own conclusory statements, Warner has failed to allege facts that Salmonsen, Guyer, or Godfrey intentionally discriminated against him based on his membership in a suspected class or that their actions lacked any rational basis. *See, Rodrigez v. Cook*, 169 F. 3d 1176, 1179-881 (9th Cir. 1999).

Similarly, Warner's attempt at advancing a conspiracy claim based upon his

41

placement in an unsanitary cell on February 7, 2020, also fails.  Warner has not

alleged facts to support the claim that Godfrey, Winner, and Walls, conspired

together. "A mere allegation of conspiracy without factual specificity is

insufficient."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F. 2d 621, 626 (9th

Cir. 1988); *see also, Olsen v. Idaho Bd. of Med.*, 363 F. 3d 916, 929-30 (9th Cir.

2004).

###### E.    Speech/Expression Claims

A prisoner retains First Amendment rights not inconsistent with his status as

a prisoner and with legitimate penological objectives of the corrections system.

*See Shaw v. Murphy*, 532 U.S. 223, 231 (2001); *Clement v. California Dep't of*

*Corrs.*, 364 F. 3d 1148, 1151 (9th Cir. 2004).

###### ·MSP Mail Policy

Warner claims that beginning in August of 2019, MSP began returning mail

to his family, friends, and Odinist organizations without providing him notice or

due process.  (Doc. 15 at 18.)  Warner claims that MSP officials maintained that

they did not have to give Warner notice or due process to deny any mail for any

reason.  Warner states that the most common reason for denying letters without

giving notice to inmates was if there was a sticker-type stamp on the envelope, but

he maintains the policy was enforced arbitrarily.  (*Id*. at 19.)  Warner believes the

unconstitutional policy was further compounded when he was told he was

responsible for informing anyone of policy updates in order to comply with MSP policy. (*Id.*) Warner notes that the policy was "suddenly" and arbitrarily changed to prohibit postcards, colored paper, all greeting cards, any type of adhesive material, or letters written in colored pencil, crayon, or marker, without forewarning or public comment. (*Id.* at 20.)

Under the First Amendment, prisoners have a right to send and receive mail. *Thornburgh, v. Abbott*, 490 U.S. 401, 407 (1989); *Witherow v. Paff*, 52 F. 3d 264, 265 (9th Cir. 1995)(per curiam). However, a prison may adopt regulations or practices for inmate mail which limit a prisoner's First Amendment rights so long as the regulations are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 79. 89 (1987). The Ninth Circuit stated, "[t]he starting point for our analysis is *Turner v. Safley*, 482 U.S. 78, in which the Supreme Corut established the framework by which we review the constitutionality of prison rules that impinge on inmates' constitutional rights. That framework is highly deferential, and it often requires us to uphold rules that, in contexts not involving prisons, would plainly violate the First Amendment." *Prison Legal News v. Ryan*, 39 F. 4th 1121, 1128 (9th Cir. 2022).

The policy to which Warner refers is MSP procedure 3.3.6. Warner filed several grievances regarding the policy, as referenced in his amended complaint. *See e.g.*, (Doc. 2-1 at 23-25.) The policy in effect at the time provided:

43

All incoming correspondence from the public cannot have any address labels, stickers, purchased postage stamps on any part of the mail. All mail must be sent with a pre-stamped envelope or USPS meter stamp indicating it was mailed directly from the USPS; exceptions may be allowed (e.g., international mail, and mail from businesses or institutions). Any mail in violation of this policy will be returned to the sending party without notice to the inmate.

This Court previously found, after weighing the *Turner* factors, that the regulations contained in Mail Procedure 3.3.6 were rationally related to MSP's legitimate penological interest of preventing the introduction of contraband into its facility. *Strizich v. Guyer*, No. CV-20-40-H-BMM-JTJ, 2024 WL 3357634, at *5 (D. Mont. July 10, 2024), appeal dismissed, No. 24-4708, 2024 WL 5375142 (9th Cir. Nov. 14, 2024)(*citing Standley v. Montana*, No. 22-2024 WL 1253787, at *3 (9th Cir. Mar. 25, 2024). Further, this Court has previously found that an MSP inmate had no constitutional right to receive non-compliant mail and that there, likewise, was no corresponding due process right to provide notice to an inmate if and when non-compliant items were returned to sender. *Strizich*, No. CV-20-40-H-BMM-JTJ, at *5.

Warner suggests that the policy was applied arbitrarily as mail staff would "pick and choose" which letters to allow through with sticker-type stamps on them, which staff would tear off, while others are arbitrarily denied. (Doc. 15 at 19.) Aside from his own conjecture, Warner provides no factual support to support this claim. Thus, Warner has not alleged a viable claim under the First or Fourteenth

44

Amendment.

·**Blanket Bans on Books and Mail**

Warner states that MSP has blanket bans on pen-pal programs and enforces the policy arbitrarily.  He also contends MSP's policy regarding "sexually suggestive" photographs is overly restrictive and violates the First Amendment. (Doc. 15 at 20.)  Warner claims the MSP policy that allows inmates to receive only 5 photos in a single envelope, with each having the inmate's name and number on the picture, creates an unnecessary burden.  (*Id*.)  Warner also claims that the MSP policy allowing inmates to receive funds and books only from approved family members or friends violates his First Amendment rights.  (*Id*. at 21.)  Warner also asserts that MSP denying inmates from utilizing "books to prisoners' programs, denies his First Amendment rights.  (*Id*.)

First Amendment rights are "necessarily limited by the fact of incarceration and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."  *McElyea v. Babbitt*, 833 F. 2d 196, 197 (9th Cir. 1987). A regulation that impinges on a prisoner's First Amendment rights is valid if it is "reasonably related to legitimate penological interests."  *Frost v. Symington*, 197 F. 3d 348, 354 (9th Cir. 1999).  Prison officials "may adopt regulations which impinge on an inmate's constitutional rights if those regulations are 'reasonably related to legitimate penological interests.'"  *Witherow*, 52 F. 3d at 265 (*quoting Turner*, 482

45

U.S. at 89).  Courts must give "substantial deference to the professional judgment of prison administrators."  *Beard v. Bank*, 548 U.S. 521, 528 (2006)(*quoting Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

Relative to the pen-pal issue, Warner was previously advised that the law provides a distinction between services that supply lists of non-prisoners, including names, addresses, and contact information, and services that match an inmate with a non-prisoner.  *See*, (Doc. 9 at 19-20)(citations omitted).  Warner was advised that he had not alleged adequate facts to show that MSP's policy violated his rights under the First Amendment.  Warner supplies no additional facts in his amended compliant to support a viable claim; simply stating his belief that MSP is somehow advancing a conservative Christian agenda, *see* (Doc. 15 at 20), is insufficient. The same analysis applies to Warner's claim that his rights were violated by MSP's policy restricting sexually explicit photos or allowing inmates to receive a limited number of photos in one envelope at a time.

Warner has not supplied any facts specific to his claims to infer that his right to free speech or expression was "impinged" as MSP's policies were applied to him.  For example, he has not identified or explained the nature of the "sexually explicit" photos he received from which this Court could infer that it the photo(s) did not fall within MSP's policy.  He has not stated how he was harmed by only being able to receive 5 photos at a time or only having only approved individuals

46

supply him with money and books.  Warner's broad generalizations lack the requisite specificity.  Moreover, the Court agrees with Defendants that Warner has failed to allege any facts demonstrating that the policies at issue were not reasonably related to legitimate penological interests.  Accordingly, the Court will defer to the judgment of prison administrators.  *Beard*, 548 U.S. at 528.

·**Denial of Books**

Warner alleges that "on several occasions" MSP has denied him books without due process and for reasons that do not conform with the First Amendment.  (Doc. 15 at 21.)  He states this has been done in relation to "history and biography" books that have been erroneously deemed to advocate some form of racial supremacy.  (Id. at 21-22.)

A review of the exhibits referenced in Warner's amended complaint show that in April of 2020 the MSP book review committee denied Warner, *March of the Titans: The Complete History of the White Race, Vol. 2.  See*, (Doc. 2-1 at 64-65.)  Warner was informed by the committee that he could not possess the book at MSP because it: advocated ethic, radical, or [that a] religious group is inferior, or national supremacy or hatred.  (*Id*. at 64.) In November of 2021, Warner was denied *Gods of the Blood: The Pagan Revival and White Separatism,* by the book review committee.  (Doc. 2-1 at 71.)  Warner alleges that the former book was returned at Warner's expense without an opportunity to appeal.  (Doc. 15 at 22.)

47

"Some content regulation is permissible in the prison context." *McCabe v. Arave,* 827 F. 2d 634 (9th Cir. 1987); *Murphy v. Missouri Dep't of Corrections*, 814 F. 2d 1252, 1257 (8th Cir. 1987)(Aryan Nation materials that advocate violence or that are so racially inflammatory as to be reasonably likely to cause violence can be banned); *Aikens v. Jenkins*, 534 F. 2d 751, 757 (9th Cir. 1976)(*Procunier* does not prohibit ban on literature that may reasonably thought to encourage violence). Conversely, "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation." *McCabe*, 827 F. 2d at 638.

While Warner may disagree with MSP's designation of the two books he was denied, he has not alleged any facts from which to infer the decision was incorrect or discriminatory.  Moreover, based upon a review of Warner's own materials, it appears the decisions of the book review committee were directly related to what they perceived to be a legitimate penological interest.  Warner has failed to allege sufficient facts to either contradict these findings or state a viable claim.

### Missing Mail

As set forth above, in 2019 Warner claims that letters he sent to Odinist groups disappeared.  Warner fails to state a viable claim because he did not explain

48

the nature or content of the letters, who he believes was responsible for their disappearance, and how he is certain that they "disappeared." Warner also alleges that copies of a letter he prepared for Montana State Representative Lynch and Dudik, who passed House Bill 763, also "mysteriously disappeared." (Doc. 15 at 23-24.) Warner does not explain how he knows that all of these letters failed to reach their respective destinations. Warner concludes that "the ONLY inference that can be drawn from the disappearance of these letters is that they were intentionally disposed of…" (*Id*. at 24.) The Court disagrees. There are simply no facts alleged to support this inference. Accordingly, this Court need not accept as true Warner's conclusory allegation or unreasonable inference regarding the "disappearing" letters. *Sprewell*, 266 F. 3d at 988.

### ·Confiscation of Drawing

Finally, Warner claims Wigert violated his right to free expression by confiscating his "religious drawing." As observed above, Warner does not supply any facts surrounding the content or description of the drawing itself or why Wigert's confiscation of the items was inconsistent with her performing her function in assessing security threats. While Warner states that as STG Sergeant Wigert is responsible for "knowing the difference between religious and gang material," (Doc. 15 at 15), he provides no factual context for this deduction. That is, he does not provide a basis explaining why Wigert's confiscation of the drawing

49

was unreasonable. Accordingly, Warner's deduction is not only unwarranted, but it also fails to state a viable claim.

### F.     Retaliation Claims

The First Amendment requires "avenues for prisoners to redress the wrongs or inadequacies of their state jailors." *Bruce v. Ylst*, 351 F. 3d 1283, 1290 (9th Cir. 2003).   "Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F. 3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F. 3d 802, 806 (9th Cir. 1995).  To establish a retaliation claim under the First Amendment, a prisoner must show: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F. 3d at 1035 (*quoting Rhodes v. Robinson*, 408 F. 3d 559, 567-68 (9th Cir. 2005).

Thus, to plead a retaliation claim, Warner must demonstrate that the exercise of his First Amendment right was a substantial or motivating factor behind defendant's conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274, 287 (1977); *Sorrano's Gasco, Inc. v. Morgan*, 874 F. 2d 1310, 1314 (9th Cir. 1989).  Warner must plead facts which suggest an absence of legitimate

50

correctional goals for the challenged conduct. *Pratt v. Rowland*, 65 F. 3d 802, 806 (9th Cir. 1995). Mere allegations of retaliatory motive of conduct will not suffice. A prisoner must "allege specific facts showing retaliation because of the exercise of prisoner's constitutional rights." *Frazier v. Dubois*, 922 F. 2d 560, 562, n. 1 (9th Cir. 1990).

### Wigert

Warner alleges that on February 5, 2019, Wigert, confiscated a religious drawing from Warner's property in an effort to retaliate against him. Wigert allegedly told Warner two days later that if he was found "not guilty," the drawing would be returned to him. However, this never occurred. (Doc. 15 at 15.) But as explained above, the "religious" nature of the drawing has still not described by Warner. Thus, there are no facts alleged to infer that Wigert should have known the drawing was religious and not STG material.

Warner suggests he was found "not guilty" but the documents he attaches in support of this contention, an informal resolution form, state that the issue was disciplinary in nature (i.e.- not grievable) and, accordingly, it was not processed. (Doc. 2-1 at 18.) When Warner lodged a second challenge, he did not comply with procedure. He was given a chance to resubmit a grievance, but it is unclear if he did so. In any event, neither grievance states what was "religious" about the drawing. Rather, Warner simply states it is "obvious that Ms. Wigert has a bias

against Odinists." *See e.g.*, (Doc. 2-1 at 19.)  At most, this is a mere allegation of retaliatory conduct, which is insufficient to state a claim.

On July 8, 2019, Wigert and IPS Officer Sam Short designated Warner as a member of an STG, allegedly without evidence.  When Warner attempted to appeal the decision, he was informed that STG validation is not appealable or grieveable.  (Doc. 15 at 22); *see also*, (Doc. 2-1 at 75-77.)  Warner states he cannot have the designation removed, which violates due process.  Warner's own documents belie this assertion.  In a subsequent challenge to his atypical status, Warner was advised that such designations are a classification matter and must follow the appropriate process.  *See*, (Doc. 201 at 79.)  Warner's failure to pursue the appropriate channels to correct what he believes to be an improper designation does not convert this matter into a de facto retaliation claim against Wigert or others.

Warner alleges that in August of 2021, Wigert wrote him up for an infraction during a visit in an effort to harass and retaliate against him, even though she knew Warner was not committing a rules infraction.  (Doc. 15 at 33.)  The Warden disagreed with the actions of Wigert and dismissed the infraction, but not because he believed Wigert to be harassing or retaliating against Warner.  Rather, it was determined that the individual with whom Warner was visiting was not, in fact, unauthorized.  (Doc. 2-1 at 20.)  Warner has not alleged any facts showing the

purported retaliation occurred, much less that it was as a result of Warner exercising his constitutional rights.

Similarly, Warner's additional allegations of retaliation by Wigert fail for lack of factual support. Warner states he filed three other grievances against Wigert, but nothing was ever done. (Doc. 15 at 33.) Warner states in October of 2021, Wigert sent Officers into Warner's cell to "tear it up" in retaliation for Warner writing grievances against her and Godfrey. (Doc. 15 at 35.) In December of 2021, Wigert, along with Godrey and Salmonsen, apparently denied Warner a gym job as retaliation and without due process. Warner claims two unidentified individuals told Warner they wanted to hire him, but he was denied for being white and for his beliefs, presumably Odinism. (Doc. 15 at 37-8.)

As demonstrated by the materials supplied by Warner, Officer McNeil looked into Warner's informal complaint about the search of his cell and found the information he received did not support Warner's account of events. (Doc. 2-1 at 108). A subsequent investigation into the claims was conducted and Warner was advised there was "no evidence that STG Wigert is harassing you or discriminating against you." (Doc. 2-1 at 152.)

Warner's claim that Wigert retaliated against him by frustrating his efforts at obtaining the job in the gym, likewise, lacks factual support. In the informal resolution referenced by Warner, Wigert is not even mentioned. While Warner

53

presumes he did not get the job because of his STG status, he was informed he was not given the gym job due to a "unit management" decision. (Doc. 2-1 at 151.)

Warner's retaliation claims against Wigert rest on nothing more than his own assumptions. Further, he has not pled any facts suggesting the absence of legitimate correctional goals for the conduct he challenges. *Pratt*, 65 F. 3d at 806. These claims will be dismissed.

### ·**Godfrey**

January of 2020, Warner was transferred back to CCC as "retaliation" for his grievances and lawsuits. Warner claimed Godfrey told him "I would find a way to fuck you" and that the transfer should do the trick since "McTighe hates you." (Doc. 15 at 24-25.) Godfrey then ensured that Warner was sent to a prison where he was assaulted, at least once, on Godfrey's behest. When he arrived at USP Terra Haute he was told by an unidentified officer that Godfrey had asked he be "taught a lesson." (*Id*. at 31.) Defendants state that Warner fails to adequately provide any factual detail showing that the transfers, particularly the 2020 transfer, were motivated by the animus or what protected conduct caused the retaliation. *See*, (Doc. 27 at 18-19.) The Court agrees.

On February 12, 2020, Warner states that Godfrey threw his classification and disciplinary appeals in the trash out of "retaliation" for grievances and lawsuits. (Doc. 15 at 30, 47.) He also claims Godfrey alone was responsible for

denying Warner a tablet during this time period as retaliation for his grievances and lawsuits.  (*Id*. at 31, 50.)

Warner acknowledges he was placed in the Max status program upon his return to MSP and that he signed a classification summary.  (*Id*. at 30.)  Thus, it is unclear how Godfrey "decided" he remain in RHU.  (*Id*. at 29.)  But Warner does not allege any facts to show that he was entitled to any appeals based upon his return to MSP and his placement in Max status.  Similarly, Warner does not provide factual support for his right to possess a tablet while in Max status.

Warner alleges Godfrey further "retaliated" by sending an email to a case-manager in May of 2020 stating that anyone could advance out of RHU "except Warner."  (Doc. 15 at 32.)  Without any additional factual support, Warner claims this e-mail alone kept him in RHU for an additional 30 days and was done in retaliation for his peaceful protest/hunger strike on February 26, 2020.  (*Id*. at 48.)

In short, there are no facts to support the contention that Warner was unable to advance out of RHU or that his time in RHU was not related to a legitimate administrative concern/penological goal.  Moreover, there are no facts alleged to show that Godfrey's purported acts were done out of retaliation for Warner's grievances/lawsuits, aside from Warner's own conjecture, or that the exercise of his First Amendment rights was chilled.  As evidenced by Warner's own exhibits to the complaint and recitation of events, he continued exercising his rights under

55

the First Amendment throughout his time at MSP.

The same analysis applies to Warner's claim that his placement in RHU in September of 2021 was retaliatory. There is no factual support for the claim and no facts pled to suggest the absence of a legitimate correctional goal. *Pratt*, 65 F. 3d at 806.

·**Additional Defendants**

Warner claims that Godfrey, Salmonsen, and Wigert arbitrarily denied him the job in the gym out of discrimination and retaliation. (Doc. 15 at 37-38.) He contends that this result shows how STG designation hinders inmates. (*Id*.) As set forth above, however, this was based on a unit management decision, and Warner has alleged no facts to show retaliatory conduct, aside from his own conclusion. Further, Warner was advised in writing that there was a managerial basis for decision.

Warner repeats the claim relating to his cell search on February 26, 2020, and, to Godfrey, adds McNeil, and 15 unidentified Doe defendants. He states they all retaliated against him by tearing his cell apart as a response/attempt to stopping his "peaceful protest" aka hunger strike. (Doc. 15 at 32.) As explained above, Warner has not alleged facts from which to infer that there was not a legitimate correctional goal, or that the act was motivated by animus.

To the extent that Warner alleges Godfrey and other officers, particularly

Harmon, Salmonsen, Reich, Foster, Swanson, and Lochrie, erroneously denied him books believing they advocated racial supremacy, *see* (Doc. 15 at 21-22), the claim was addressed above. Warner cannot save the deficient free expression claim by recharacterizing it as a retaliation claim.

Warner states that Reich and Lochrie retaliated against him by not allowing him to grieve the confiscation of his religious drawing. (Doc. 15 at 48.) As set forth above, his initial informal resolution was returned as not processed by Reich on March 4, 2019, as she believed the issue to be disciplinary in nature and not grievable. *See*, (Doc. 2-1 at 18.) The informal was returned to Warner. When Warner resubmitted grievance, it was not processed as Warner had changed the action requested; Warner was given 48 hours within which to resubmit a grievance. (*Id*. at 19.) It is unclear if Warner ever did so. Regardless, Warner has failed to allege facts demonstrating either retaliation or a link to protected speech. *See, Wood v. Yordy*, 753 F. 3d 899, 905 (9th Cir. 2014)("[M]ere speculation that the defendants acted out of retaliation is not sufficient.").

Similarly, Warner surmises that Defendants Renfroe, Walls, and unidentified Doe defendants retaliated against him with the disappearance of letters he tried to mail in February of 2020. Warner states that all of the letters "mysteriously disappeared," never reaching their respective destinations. (Doc. 15 at 23-24.) Warner states the "retaliation" continued because 14 Odinist letters also came up

57

missing in late 2021.  He surmises this may have happened as a consequence of Warner using his legal name.  (*Id*. at 24.)  Warner believes that Reich ensured that the disappearance of his mail was not investigated.  Warner's claims relating to the missing letters were addressed above.  Consideration of the matter in light of the alleged retaliation is similarly unavailing.  Warner does not allege specific facts to show the purported retaliation was due to the exercise of his constitutional rights. *Frazier*, 922 F. 2d 562.

Finally, Warner alleges that on September 28, 2021, the day his cell was "destroyed," unidentified Doe defendants broke his religious medallion.  Warner believes the fact of MSP's reimbursement for his property proves retaliation. (Doc. 15 at 34-35.)  As explained herein, Warner also believes additional personal property and clothing of his was destroyed in retaliation for his grievances and lawsuits.  (*Id*. at 50.)  Defendants argue that Warner merely speculates as to the motivation of unidentified officers and that retaliation cannot be inferred based upon what is alleged.  *See*, (Doc. 27 at 24.)  Again, the Court agrees.

Warner's retaliation claims remain unsupported by sufficient facts; they will be dismissed.

### G.  Untimely Claims

In a prior order, Warner's Fourth Amendment claims alleging the use of excessive force claims on January 3, 2019, by Lt. Olive and Sgt. Marquez were

58

dismissed as they fell outside the applicable 3-year period.  *See*, (Doc. 19 at 4.)

Specifically, this Court found that claims which accrued before January 28, 2019,

were outside of the applicable limitations period.

As set forth herein, the bulk of the claims advanced by Warner are against

MSP.  CoreCivic Defendants note that while Warner makes factual claims against

CoreCivic Defendants, he only advanced a legal claim against Defendant

McTighe.  (Doc. 19 at 4-5, 6.)   Defendants argue that the conspiracy, retaliation,

and due process claims against McTighe all arose from a disciplinary action

surrounding an assault that occurred at Crossroads on June 25, 2018.  Because

Warner should have known that he had a cause of action for the allegedly wrongful

disciplinary action and the corresponding claims arising therefrom on June 25,

2018, the claims accrued on the same day.  Accordingly, CoreCivic Defendants

argue that the claims ran on June 25, 2021, more than six months before Warner

filed his original complaint.  (*Id.*)  The Court concurs.

The U.S. Supreme Court in *Wilson v. Garcia*, 471 U.S. 261 (1985),

determined the applicable statute of limitations for claims filed pursuant to 42

U.S.C. §1983 is the state statute of limitations governing personal injury actions.

A three-year period after an action accrues applies in Montana.  *See*, Mont. Code

Ann. §27-2-204(1).  Accordingly, the claims surrounding the June 25, 2018

incident against Defendant McTighe will be dismissed.  Similarly, to the extent

that Warner alleges Godfrey somehow conspired with McTighe regarding this disciplinary event, *see* (Doc. 15 at 13-14), such claims are also untimely and will be dismissed.

Warner also alleges that he was denied a medically necessary diet for gluten intolerance while incarcerated at MSP in 2018.  He apparently brought this issue to MSP officials attention in January and February of 2018.  *See*, (Doc. 15 at 26-27, 61); *see also*, (Doc. 2-1 at 177-179.)  Warner grieved the issue and was advised in April of 2018 that he would need to meet with the dietician and obtain a doctor's order for a special diet.  (Doc. 2-1 at 180.)

Similarly, Warner has advanced claims alleging he was denied a nutritionally sufficient diet by Trinity Services, a food contractor for CoreCivic, during his "lockdown" at CoreCivic in September and October of 2018, in violation of the Eight Amendment.  *See*, (Doc. 15 at 39-40, 61); (Doc. 2-1 at 165-170.)  Warner grieved this issue.  On December 19, 2018, the grievance was denied, and Warner was informed that the menus provided at CoreCivic were reviewed by dieticians to make sure they met nutritional requirements and that if Warner disagreed, he would need to inform someone to further investigate his nutritional needs.  *See*, (Doc. 2-1 at 170.)

Because both of these food/diet related claims accrued before January 28, 2019, they also will be dismissed as being outside of the applicable limitations

60

period.  Consequently, Defendant Trinity Services is dismissed from this matter.

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      MSP Defendants' motion to dismiss (Doc. 26) is GRANTED in full.

2.      CoreCivic Defendants' motion to dismiss (Doc. 28) is GRANTED in full.

3.      Defendant Trinity Services is DISMISSED from this matter.

4.      The Clerk is directed to close the case and enter judgment in favor of the defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

5.      The Clerk of Court is directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.  The record makes plain that Warner fails to state a claim and further amendment would be futile.

DATED this 30th  day of March, 2026.

/s/ Dana L. Christensen
Dana L. Christensen
United States District Court Judge